Edward **JAMES**, William F. Jackson, John H. Rivers, and S.E. Sanders, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

**CITY OF SARASOTA, FLORIDA:** Fred E. Soto, Mayor of Sarasota, Florida; Ron Norman, Vice-Mayor; T.J. "Tony" Sarito, Rita Roehr, William McCullough, City Clerk of Sarasota, Florida, their successors and agents, all in their official capacities, Defendants.

No. 79–1031–Civ–T–GC.

United States District Court, M.D. Florida, Tampa Division.

Jan. 25, 1985.

Supplemental Decision May 24, 1985.

David M. Lipman, Robert E. Weisberg, Miami, Fla., Henry G. White, Sarasota, Fla., for plaintiffs.

Robert M. Fournier, Robert Taylor, Sarasota, Fla., for defendants.

## MEMORANDUM DECISION

GEORGE C. CARR, District Judge.

Four black residents of Sarasota, Florida, filed this action in 1979 to challenge the method by which Sarasota city commissioners are elected. The plaintiffs contended that the election of five at-large commissioners violated the Voting Rights Act of 1965, 42 U.S.C. § 1973 *et seq.* and the thirteenth, fourteenth and fifteenth amendments to the United States Constitution.[1] The defendants are the five members of the city commission. The suit sought a declaratory judgment that the at-large system diluted black voting strength, an injunction barring the defendants from holding any other elections under the at-large system and an order requiring the commissioners be elected from single-member districts.

When the lawsuit was filed, the commission candidates ran for numbered seats and had to receive a majority of the votes cast to win. Single shot voting in which voters

---

1. The plaintiffs dismissed their allegations that the city's election plan violated the Constitution and proceeded solely on the statutory allegations.

can concentrate their votes behind one candidate was not permitted. Although seven black candidates had run in eleven elections, none had been elected. On the eve of the trial of this case, the Sarasota city commissioners admitted that the at-large election system violated the Voting Rights Act and agreed to devise a new method.

After the parties were unable to reach an agreement, the plaintiffs and the city each submitted a proposed plan to the Court. The city's proposal divides the city into three districts. Three commissioners would be elected by a plurality of the voters in each district. In addition, two commissioners would be elected at-large by a plurality vote. The at-large seats would not be numbered and thus the two candidates who received the most votes would be elected. The city submitted its so-called 3/2 plan and the plaintiffs' 5/0 plan to the voters in a referendum in November, 1983. The voters selected the city's 3/2 plan. This court must now determine whether that plan violates section 2 of the Voting Rights act, as amended, Pub.L. No. 97–205, § 3, 96 Stat. 134 (1982), amending 42 U.S.C. § 1973.

Congress enacted the Voting Rights Act of 1965 under the enforcement section of the fifteenth amendment. The Act, as amended, provides in pertinent part:

A violation ... is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election ... are not equally open to participation by members of a class of citizens protected by subsection (a) ... in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

96 Stat. at 134, § 3.

■ Therefore proof of discriminatory intent as required by the United States Supreme Court in *City of Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), is no longer needed. The city's plan violates the Act if black voters in Sarasota have less chance than the other voters to participate in politics and to elect the candidates of their choice. The amended Act, however, specifically provides that minorities do not have the right to proportional representation. Thus, an election plan need not guarantee that the candidate supported by minority voters is elected.

■ The city's 3/2 proposal is a legislative plan since it was approved by a voter referendum as an amendment to the city charter.[2] *See Wise v. Lipscomb,* 437 U.S. 535, 98 S.Ct. 2493, 57 L.Ed.2d 411 (1978). The Supreme Court has held that absent special circumstances, court-ordered election plans should have single-member districts. *See Connor v. Johnson,* 402 U.S. 690, 91 S.Ct. 1760, 29 L.Ed.2d 268 (1971); *Connor v. Williams,* 404 U.S. 549, 92 S.Ct. 656, 30 L.Ed.2d 704 (1972); *Mahan v. Howell,* 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973); *Chapman v. Meier,* 420 U.S. 1, 95 S.Ct. 751, 42 L.Ed.2d 766 (1975) and *East Carroll Parish School Board v. Marshall,* 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976). However, the Court has not so restricted legislative plans. *See Wise, supra.*

Under the city's proposal, the boundaries of one of the three districts, District One, would be drawn so that 50.1 percent of the district residents were black. According to the city's statistics, 42.6 percent of the voting age population in District One would be black and 43.3 percent of the registered voters would be black. The remaining two districts would have almost no black residents. The plaintiffs' plan calls for a district with a black population of 72.7 percent with 66.2 percent of the voting age residents and 56.4 percent of the registered voters black. The central question thus becomes whether blacks must be far more than a majority of the population of a district to meet the requirements of the Act. The plaintiffs urge this Court to require

---

2. Sarasota is a charter municipality pursuant to article VIII, § 2(b) of the Florida Constitution and is governed by the Florida Municipal Home Rule Powers Act, Fla.Stat. § 166.021 which requires a referendum to change election plans.

that District One boundaries be drawn so that at least 65 percent of the population is black.[3] After a two-day evidentiary hearing and from studying the reports submitted by both parties' experts and the applicable law, this Court concludes that the city's proposed plan meets the requirements of the Act.

■ The Voting Rights Act requires that minorities have an equal opportunity to elect representatives of their choice. The testimony at the evidentiary hearing showed that it is likely that a black candidate will be elected by the voters of the city's proposed District One.[4] Experts for both the plaintiffs and the city agreed that although blacks would not be a majority of the District's voting age population, a black candidate could be elected if black voter turn-out exceeds the turn-out of white voters in the District.

According to the study conducted by Dr. Charles S. Bullock, the political scientist hired by the city, the mean black voter turn-out in the 11 city elections in which black candidates ran was 31.5 percent, or 6.8 percentage points higher than the mean turn-out for the white voters. Within the boundaries of the proposed District, white turn-out has been consistently, and in most elections significantly, lower than the turn-out of white voters citywide. The study shows that in some elections the white voter turn-out in District One precincts which were heavily white has been 7 to 11 percentage points lower than the citywide turn-out for white voters. The black voter turn-out, according to Dr. Bullock's study, exceeded the turn-out of white voters within the District in 10 of the 11 municipal elections in which blacks ran. In 1970, the black turn-out rate exceeded the rate for white voters in District One by 30.8 per-

centage points and in the two most recent elections, the rate for black voters was 20 percentage points higher. Dr. Bullock concluded that the mean turn-out for black voters was 31.5 percent for the 11 elections in which black candidates were on the ballot compared with a mean rate of 19.4 percent for white voters in the District.

No one can predict future election results with certainty. However, this Court must determine whether the city's proposal would afford black voters an equal opportunity to elect a representative of their choice as required by the Voting Rights Act. Political scientists must rely on patterns from past elections to predict the results of future races. Those patterns show that the black voters of District One could, and in fact probably would, elect a candidate of their choice. Dr. Bullock used the 35.4 percent mean turn-out of black voters in the four general elections in which black candidates ran and the 2,837 black registered voters in the District to conclude that a black candidate who ran for the Sarasota city commission from District One would receive 1,004 votes from blacks. Even using the higher citywide voter turn-out rather than the turn-out for District One whites, Dr. Bullock projected that the candidate supported by the black voters would win. With the citywide turn-out figures, the candidate supported by the white voters would receive 968 votes and thus lose the election.

Sarasota elections have been marked by racially polarized voting. Dr. Richard L. Engstrom, who studied racially polarized voting in Sarasota, concluded that from 67 percent to 95 percent of the whites voted for white candidates in the 11 municipal elections in which a black candidate ran. Almost all black voters cast their ballots

---

3. The 65 percent figure stems from a U.S. Justice Department requirement in Section 5 cases. The government determines that a state reapportionment plan is an impermissable retrogression if the number of districts with at least 65 percent minority population decreases under the plan. The government arrived at the 65 percent figure by adding 50% (a majority) and 5 percent (because minority populations tend to be younger than the white population) and 5

percent (because fewer minorities register to vote) and 5 percent (because minorities vote less often than whites).

4. The Court will use the term black candidate to refer to the candidate supported by black voters although the Court recognizes that black voters may support white candidates in some elections.

for black candidates. There was, however, some cross-over or whites voting for black candidates. Dr. Bullock found that the mean cross-over for the four general elections in which blacks were on the ballot was 21.5 percent. If 21.5 percent of the whites in District One were to vote for a black candidate, then 208 of the votes cast by whites would go to the black candidate. When added to the 1,004 votes the black candidate would receive from black voters, it shows that the black candidate would win 1,212 votes as compared with the 706 votes for the white candidate.

Voter turn-out is a by-product of voter registration. As the turn-out of white voters in District One has been substantially lower than the turn-out for white voters citywide, the registration rate for whites in the District has also been lower. Only slightly more than 58 percent of the voting age whites in District One are registered to vote while citywide 77.1 percent of the eligible whites had registered. The registration rate for blacks in District One was only slightly higher than the rate for white residents of the District.[5]

Not only will black voters have an equal opportunity to elect a city commissioner from District One under the city's proposed plan, blacks will also have a chance to elect a commissioner from one of the two at-large seats. Plurality voting and single-shot voting will help candidates supported by the black community. The two candidates with the most votes will win and thus the chance of electing a black candidate increases because the system will not pit a black candidate against a white one. Since none of the candidates will know what percentage of the vote will be needed to win,

they will have to appeal to all the voters. Thus, the city's proposal will permit the black voters to influence the election of three of the five members of the city commission.

There are several other advantages to the city's 3/2 plan over the plaintiffs' 5/0 proposal. Dr. Susan MacManus, who studied the migration patterns of the black community in Sarasota, noted that the black population is dispersing. The 3/2 plan permits blacks who live outside District One to vote for black candidates who run at-large. The 3/2 plan also encourages at least two members of the city commission to be concerned with the city as a whole rather than just the area which they represent.[6]

The plaintiffs dispute the city's theory that the 3/2 plan would give blacks an equal chance to elect the candidate of their choice. The plaintiffs' expert, Dr. Engstrom, concluded that there was little chance a black would be elected to represent District One. Dr. Engstrom's analysis was based on the estimate that 32.8 percent of the registered voters in District One were black. However, city workers counted the number of black registered votes in the District shortly before the evidentiary hearing and determined that 43.3 percent of the voters were black. This disparity weakens Dr. Engstrom's conclusion. The Court therefore finds that Dr. Bullock's analysis, which was based on the actual black registration in the District rather than an estimate, better predicts the outcome of future elections in the District.

The plaintiffs challenge Dr. Bullock's findings for several reasons. They argue

---

**5.** Political scientists believe that voter registration is linked to socio-economic status. Dr. Susan MacManus, who studied the demographics of Sarasota, found that although District One was not racially homogenous, it was homogenous in terms of the socio-economic level of the residents.

**6.** Dr. MacManus concluded that mixed election plans in which some representatives run at-large and the others from districts, provided significantly greater opportunity for blacks to participate in elections than the pure at-large

plans and not much less chance than the single-member districts. The ratio of black representation on city councils to the percentage of minority representation was .7 in mixed plans in a study of Southern cities from 1970–81. For single-member districts, the ratio was .87 and for at-large systems it was .39. Thus, blacks had the best chance to have the city council reflect the racial composition of the city under single-member districts but their chance did not substantially decline under the mixed plans.

that his conclusions, which were based on past election results, are unsound because a candidate who runs in a District rather than at-large will focus his attention and resources in that District. They also note that the white candidate will live within the District One and therefore will receive more support from the white voters in the District than white candidates living outside the District did in the past. The plaintiffs also fear that a "white counter-mobilization" might increase white voter registration and white voter turn-out so that the black candidate would lose. In addition, the plaintiffs question Dr. Bullock's theory because it is based on the hypothesis that black voters uniformily vote for black candidates.

The Court finds the plaintiffs' arguments for rejecting Dr. Bullock's analysis unpersuasive. Dr. Bullock based his theory on the statistics from past elections. He relied solely on objective criteria. The plaintiffs put forth various scenarios, such as the "white counter-mobilization," which are based on pure speculation. Their predictions of increased white voter registration and white voter turn-out are also not supported by the evidence. Although the plaintiffs challenge Dr. Bullock's assumption that blacks vote for black candidates, they argue that racially polarized voting is widespread in the city. The plaintiffs are essentially asking this Court to order city officials to draw the district lines so that the candidate supported by the black community is assured of winning the election. This may be a worthy goal but it is not one mandated by the Voting Rights Act.

The plaintiffs urge this Court to adopt the 5/0 plan so that 72.7 percent of the population of the district is black. They note that the Fifth Circuit rejected an election plan which had districts with blacks as a majority of the population but not of the voting age population. *See Kirksey v. Board of Supervisors*, 554 F.2d 139 (5th Cir.1977). In *Kirksey*, the defendants devised an election plan which split the black population of Jackson, Miss., between two districts. In rejecting the plan, the *en banc* Court noted,

Where the cohesive black voting strength is fragmented among districts, the presence of districts with bare black *population majorities* not only does not necessarily preclude dilution but ... bare population majorities may actually enhance the possibility of continued minority political impotence.

554 F.2d at 150, citing *Moore v. Leflore County Board of Education*, 502 F.2d 621 (5th Cir.1974). There is no indication that the *Kirksey* defendants took steps, such as adopting single shot voting, to prevent minority vote dilution as have the defendants in the instant case. Nor was there evidence in *Kirksey* that low white voter turn-out would give blacks a good chance to elect their candidate although they were not a majority of the district's voting age population.

The plaintiffs also rely on *United Jewish Organizations v. Carey*, 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1980) in which the Supreme Court upheld a state election plan which created a district which was 65 percent black. The Court ruled that the Voting Rights Act permits race to be considered when district lines are drawn and that such consideration is not unconstitutional. However, the Court did not rule that the Act requires that minorities be 65 percent of the population of a district. Accordingly, *United Jewish Organization* does not preclude Sarasota from adopting the 3/2 election plan. If it were not for the structure of the city's plan and the demographics of District One, including the low white voter turn-out, this Court might agree with the plaintiffs that blacks would not have an equal opportunity to elect their candidates unless they were a majority of the District's voting age population. However, the Court is convinced that the city's proposed plan complies with the Voting Rights Act.

The plaintiffs also request that this Court examine the evidentiary factors which Congress has said contributes to a finding that a voting plan violates Section 2

of the Act.[7] Those factors—the extent of past discrimination, racially-polarized voting, election devices which enhanced the opportunity for discrimination, minorities suffering from the effects of discrimination, minorities elected to public office, political campaigns marked by racial appeals and minorities denied access to candidate slating—would apply if this Court were examining an election plan which had been in effect. However, the city has admitted that the election plan it used in the past violated the Act and thus examining these factors would merely lead to the conclusion that the former election plan denied black voters equal opportunity to elect the candidates they supported. An analysis of the factors does not aid this Court in determining whether the proposed plan meets the requirements of the Act.

■ The only remaining issue is implementation of the election plan. The city has filed a report suggesting a 3–2–0 seat rotation plan in which the three district elections would be held in the first year, the two at-large the following year and no election held the third year. In the report, the city also suggests various plans for adopting that rotation. This Court believes the effects of the new election plan will be best determined if all city commission seats are filled in one election initially. Therefore, the city is hereby Ordered to hold elections for all five seats in accordance with the terms of this Order in the spring of 1985. The three district seats will have three-year terms and the two at-large seats four-year terms so that the commission will have a 3–2–0 rotation. In future elections, the at-large terms will be for three years.

■ Because of the city's admission that the former election plan violated the Voting Rights Act, this Court has had the task of deciding whether an election plan which has not been tested affords black voters an equal opportunity to participate in the electoral process and elect the representatives of their choice. Thus, the question has not

been whether the law has been violated but rather whether it will be violated. By necessity, that determination has been based on hypothesis. Therefore, this Court hereby retains jurisdiction of this matter for a period of time after the 1985 city commission election so that it can review the results of the election to determine whether the election plan complies with the requirements of the Act.

The defendant is to report the results of the 1985 spring election to the court within thirty (30) days of the election.

## SUPPLEMENTAL DECISION

In the Memorandum of Decision of January 25, 1985, this Court retained jurisdiction over this Voting Rights Act case to determine whether the City of Sarasota's election plan afforded black voters an equal opportunity to elect the representatives of their choice. In accordance with this Court's Order of January 25, the city held municipal elections on April 9, 1985. For the first time in the city's history, a black was elected to the city commission.

Two black candidates and one white candidate ran for the District One seat on the city commission. The two black candidates received 84.5 percent of the vote. The white candidate, who was a former mayor and city commissioner in Sarasota, received only 15.5 percent. According to Dr. Bullock's projections, the District One black candidate should have gathered 1,212 votes in the election. In actuality, 1,676 voters in District One voted for one of the two black candidates. Dr. Bullock had predicted that the white candidate running in the district would receive 706 votes. However, only 307 voters cast their ballots for the white candidate.

Dr. Bullock correctly predicted that the black candidate would be helped by a higher turn-out of black than white voters in the District. According to the election returns, 47.2 of the eligible blacks in the

---

7. S.Rep. No. 97–417, 97th Cong., 2d Sess. 27–29 (1982), U.S.Code Cong. & Admin.News 1982, p. 177.

District voted compared to 18.6 percent of the whites. The white voter turn-out which historically had been lower than the white turn-out throughout the city, was seven percentage points below the 25.9 percent citywide figure. The black candidates also received votes from the white residents. Dr. Bullock had projected a 21.5 percent cross-over in the District. During the April election, 56.2 percent of the whites in District One cast their ballots for a black candidate.

In the at-large election, the black candidate ran last among the four candidates. The other three candidates, however, were incumbent commissioners. The black received 2,020 votes. The two winning candidates received 4,610 and 4,190 votes. The statistics submitted to the Court by the city show that 13.3 percent of the whites voted for the black at-large candidate. In addition, he received 45 percent of his support from the predominately white Districts of the city.

■ Accordingly, the Court determines that the city's election plan does provide the black voters of Sarasota an equal opportunity to participate in the political process and to elect representatives of their choice. The Clerk of the Court is hereby Ordered to enter a judgment in favor of the defendants and against the plaintiffs. Furthermore, the Court relinquishes jurisdiction of this case.

## APPENDIX

Honorable George C. Carr
United States District Judge
United States District Court for the Middle District of Florida
601 North Florida Avenue
Tampa, Florida 33602

Re: *Edward James v. City of Sarasota, Florida,*

Case No. 79–1031–Civ–T–GC (M.D.Fla.)

Dear Judge Carr:

Your January 25, 1985, memorandum decision and order entered in the above-styled case recently came to my attention. Because it contains a factual misstatement concerning standards applied by the Department of Justice in enforcing Section 5 of the Voting Rights Act, 42 U.S.C. 1973c, I thought it appropriate to bring the matter to your attention and explain the standards which the Department in fact applies in such circumstances.

At pages 4–5 and footnote 3 of your slip opinion, it is noted that plaintiffs had sought a districting plan containing a district in which 65 percent of the population would be black. The footnote states that "[t]he 65 percent figure stems from a United States Justice Department requirement in Section 5 cases. The government determines that a state reapportionment plan is an impermissible retrogression if the number of districts with at least 65 percent minority population decreases under the plan."

There is no 65 percent threshold population figure applied as a rule of thumb by the Department in redistricting matters reviewed under Section 5. Rather, our responsibility is to determine whether the number of districts in which minority voters will have a fair opportunity for electing representatives of their choice (whatever the percentage of minority voters in each district) has been decreased by the proposed redistricting plan submitted under Section 5. If so, the submission results in an impermissible retrogression of minority voting strength and cannot receive Section 5 preclearance. See *Beer v. United States,* 425 U.S. 130 (1976).

In this context, the Section 5 inquiry is much less concerned with discrete percentages of minority voters in reconfigured districts than with how those new district populations compare with the district population currently in place. We find figures on minority voting-age populations far more useful to the analysis than total minority population percentages. But in neither case do we attach particular significance to a 65 percent population figure, and no attempt is made to add arbitrarily increments of five percentage points each

to compensate for age, registration and turn-out differences.

Accordingly, the Attorney General has frequently concluded, based on the facts presented in a particular submission, that districts containing a minority population significantly less than 65 percent of the total are racially fair districts and that the plan submitted is entitled to Section 5 preclearance. On the other hand, there have also been occasions when preclearance has been denied under Section 5 on a finding—based on a comparison with the existing configuration—that a proposed district with a minority population greater than 65 percent will not provide minority voters the same opportunity to elect representatives of their choice that they currently enjoy. Each Section 5 submission must, of course, be evaluated in light of the particular factual circumstances prevailing in the affected political jurisdiction and whether or not a districting plan meets Section 5 preclearance requirements is determined within the context of those facts—not on the basis of some preordained population percentage.

The Department was not before the court in the *James* case, and we therefore did not have an opportunity to correct misinformation apparently furnished to the court regarding our Section 5 review procedures. This letter is simply to apprise the court of the Department's actual position so as to ensure that the error in footnote 3 is not perpetuated.

I appreciate your consideration of this matter. Copies of this letter are being mailed to counsel of record.

> Sincerely,
> /s/ Wm. Bradford Reynolds
> Wm. Bradford Reynolds
> Assistant Attorney General
> Civil Rights Division

### ORDER

The Court received the attached letter from Wm. Bradford Reynolds, chief of the civil rights division of the Justice Department, on April 9, 1985. To ensure that the record is complete, the Clerk of the Court is hereby directed to file the letter in the Court record and send copies of the letter and this Order to counsel of record and Mr. Reynolds.

DONE AND ORDERED in Chambers at Tampa, Florida, this 9th day of April, 1985.