998 F.2d 1266
 Edna HINES; Inell Thomas; James Reynolds; Ahoskie Civic
Association, Plaintiffs-Appellees,
v.
MAYOR AND TOWN COUNCIL OF AHOSKIE, Defendant-Appellant,
and
Christine Callis, in her official capacity as Supervisor of
elections of Hertford County; Hertford County
Board of Elections, Defendants.
Edna HINES; Inell Thomas; James Reynolds; Ahoskie Civic
Association, Plaintiffs-Appellants,
v.
MAYOR AND TOWN COUNCIL OF AHOSKIE, Defendant-Appellee,
and
Christine Callis, in her official capacity as Supervisor of
elections of Hertford County; Hertford County
Board of Elections, Defendants.
 Nos. 92-2590, 92-2593.
 United States Court of Appeals,
Fourth Circuit.
 Argued May 3, 1993.
Decided July 15, 1993.
 
 Michael Crowell, Tharrington, Smith & Hargrove, Raleigh, NC, argued (Douglas A. Ruley, Tharrington, Smith & Hargrove, Raleigh, NC, Larry S. Overton, Overton & Carter, Ahoskie, NC, on brief), for defendant-appellant.
 Neil Bradley, ACLU Foundation, Inc., Atlanta, GA, argued (Mary Wyckoff, Kathleen L. Wilde, Laughlin McDonald, on brief), for plaintiffs-appellees.
 Before WILKINS and HAMILTON, Circuit Judges, and WILLIAMS, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.
 OPINION
 HAMILTON, Circuit Judge:
 
 
 1
 The Town of Ahoskie, North Carolina (Ahoskie), appeals the decision of the district court holding that Ahoskie's proposed election plan for the five members of its Town Council violated § 2 et seq. of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973 et seq. (the Act), and the district court's subsequent decision to reduce the size of the Town Council to four members. Edna Hines and several other black citizens of Ahoskie (Hines) cross appeal the district court's refusal to implement an election plan providing three out of five single-member districts with a majority black population.
 
 
 2
 Although we believe the district court properly rejected Hines' proposed election plan, we think the district court erred by refusing to implement Ahoskie's proposed plan. Thus, we reverse the decision of the district court and remand with instructions for the district court to order Ahoskie's election plan implemented.
 
 
 3
 * Ahoskie is a small town located in Hertford County, North Carolina. The town has a total population of 4,531, comprised of 2,286 (50.5 percent) blacks and 2,245 (49.5 percent) whites. The voting age population within the town is 3,343, of which 1,818 (54.4 percent) are white and 1,525 (45.6 percent) are black. Before this litigation arose, the town elected its Mayor and five Town Council members through at-large elections. The Mayor performed mainly ceremonial duties, but voted on matters before the Town Council when it was deadlocked.
 
 
 4
 A review of the previous twenty-two elections in Ahoskie and the surrounding Hertford County reveals a history of racially polarized voting. Specifically, an average of 93 percent of the blacks voted for black candidates and 93.4 percent of the whites voted for white candidates. In the most recent election in Ahoskie between a white and black candidate--the 1991 Mayoral race--the white candidate won by a vote of 620 to 573. In that election, 663 white citizens voted and 508 black citizens voted. The white crossover vote was an estimated 16.2 percent. In the history of Ahoskie, while seven blacks ran for a position on the Town Council, only two of those individuals have ever been elected.
 
 
 5
 Hines originally filed this action on November 1, 1989, alleging in part that Ahoskie's at-large system for electing the five Town Council members impermissibly diluted black voting strength and denied members of the black community an equal opportunity to elect representatives of their choice in violation of § 2 of the Act. Hines predicated her claim primarily on the fact that only two black individuals had ever been elected to Ahoskie's Town Council.
 
 
 6
 In response to Hines' complaint, Ahoskie stipulated that its existing electoral system diluted black voting strength in violation of § 2 of the Act. As a proposed remedy, Ahoskie devised an election plan in which the town would be divided into two districts, one majority black and the other majority white. Under this new plan, two Town Council members would be elected from each district by a plurality vote within the district. The plan also provided for the fifth Town Council member to be elected at-large from the entire town population.[1]
 
 
 7
 In January 1991, after the district court decided that § 5 of the Act required the United States Attorney General to preclear the plan, Ahoskie submitted the plan for preclearance. Hines lodged several objections to Ahoskie's proposal with the Attorney General. Nevertheless, after conducting a six-month review of the plan, the Attorney General gave its preclearance on August 11, 1991.
 
 
 8
 Ahoskie then submitted its plan to the district court for approval in the form of a motion for summary judgment. Hines opposed Ahoskie's motion, arguing that the at-large election for the fifth Town Council seat continued to dilute minority voting strength. Hines reasoned that the at-large position would be beyond the reach of black voters given the makeup of the voting age population and the racially polarized political environment of Ahoskie.
 
 
 9
 As part of their objection, Hines presented two alternative election plans. The first plan proposed to divide Ahoskie into three districts: the first with an eighty percent black voting age population, the second with a ninety-two percent white voting age population, and the third with a fifty-five percent black voting age population. Districts I and II contained approximately 1,800 citizens each and would each elect two members to the Town Council. District III, which Hines termed a "swing district," contained roughly 900 citizens and would elect one member to the Town Council.[2] Hines' second plan proposed to divide the town into five single-member districts, each having roughly 900 citizens. Three of the proposed districts under this plan would have substantial black voting age majorities and two districts would have substantial white majorities.
 
 
 10
 On February 4, 1992, the district court conducted a hearing on Ahoskie's summary judgment motion. During the hearing, Hines' expert, Steven Cole, testified that, in light of Ahoskie's historical voting patterns, blacks would be unable to elect a candidate of their choice to the at-large position. Thus, Cole concluded that Ahoskie's proposed plan continued to dilute minority voting strength. Ahoskie's expert, Dr. Theodore Arrington, testified that the ideal electoral plan for Ahoskie's Town Council would include two black seats, two white seats, and then a swing district for the fifth seat. However, Arrington added that a true swing district would not be possible in a town the size of Ahoskie because such a district would have only 900 people, and a small movement of twenty people would alter the racial balance such that the district would not remain a true swing district. Arrington also noted that Hines' proposed swing district, with a fifty-five percent black voting age population, would actually be a safe black district guaranteeing blacks three of the five seats on the Town Council.
 
 
 11
 After reviewing all the evidence, the district court found the part of Ahoskie's proposal calling for two districts electing two Town Council members each "maximized minority voter strength." (Joint Appendix (J.A.) 306). However, the district court also found the at-large election for the fifth Town Council position to be "problematic." (J.A. 306-07). The district court reasoned that, given Ahoskie's historical voting patterns, the at-large election "effectively provided [whites] with three 'safe' seats." Id. Thus, the district court found that Ahoskie's plan did not provide the complete remedy required by the Act.
 
 
 12
 In fashioning the appropriate remedy, the district court announced the following principle as controlling: "When a district court is presented with a legislative election plan that violates constitutional or statutory norms, the court should reject the plan only to the extent necessary to cure its specific deficiencies." (J.A. 308) (citation omitted). The district court also found that Ahoskie would not support a true "swing" district, reasoning: "based on the testimony of Dr. Arrington, ... there is insufficient data to determine with certainty that the proposed ... swing district is truly a swing district and not a 'safe' minority district." (J.A. 309). Thus, in order to provide the maximum relief possible, the district court elected to retain the two districts proposed by Ahoskie, but to eliminate the fifth Town Council position.[3]
 
 
 13
 Consequently, the district court ordered Ahoskie to implement an election plan with only four Town Council members, two of which would be elected by a majority black district and two of which would be elected by a majority white district. In adopting this remedy, the district court rejected Hines' argument that "the elimination of the fifth seat ... would effectively give control of the Town Council to whites, because the Mayor, elected at large, casts the tie vote if the council is deadlocked." (J.A. 308 n. 8). The district court reasoned: "it would be pure speculation to say that the new four-member town council could not resolve its differences and the Mayor would become a de facto member of the Town Council through frequent tie-breaking votes." Id.
 
 
 14
 Ahoskie now appeals the district court's rejection of its 2-2-1 plan and the subsequent order eliminating the fifth position on the Town Council. Hines cross appeals the district court's refusal to implement a plan with three majority black, single-member districts.
 
 II
 
 15
 In its appeal, Ahoskie claims that the district court erred by reducing the size of the Town Council from five members to four. Ahoskie reasons that its proposed 2-2-1 plan provided the maximum remedy possible under § 2 of the Act for prior vote dilution. Thus, Ahoskie concludes that the district court should have implemented Ahoskie's plan in full rather than eliminating the fifth Town Council member position. We agree.
 
 
 16
 Section 2 of the Act provides, in pertinent part:
 
 
 17
 (a) No voting qualification on a prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any state or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or [because the citizen is a member of a language minority group], as provided in subsection (b) of this section.
 
 
 18
 (b) A violation of subsection (a) of this section is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the state or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the state or political subdivision is one circumstance which may be considered: provided, that nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.
 
 
 19
 42 U.S.C. § 1973. Under the Act, a vote dilution challenge to an at-large election scheme essentially alleges that "if voting is racially polarized, a white majority is able to consistently elect its candidate of choice, submerging the preferences of minority voters. [If] the district [were] divided into smaller single-member districts, one or more with a majority of minority group voters, the electoral results [might] more fully reflect societal values." McNeil v. Springfield Park District, 851 F.2d 937, 938-39 n. 1 (7th Cir.1988).
 
 
 20
 When analyzing a § 2 challenge to an election plan proposed by a legislature as a remedy for a prior vote dilution, this court accords great deference to legislative choices. McGhee v. Granville County, 860 F.2d 110, 115 (4th Cir.1988). Under this deferential approach, "where ... the legislative body ... respond[s] with a proposed remed[ial electoral plan], a court may not thereupon simply substitute its judgment of a more equitable remedy for that of the legislative body; it may only consider whether the proffered remedial plan is legally unacceptable because it violates anew constitutional or statutory voting rights." Id. Accordingly, "[a]ctionable vote dilution must be measured against the number of positions in the existing governmental body rather than some hypothetical model based upon whatever size is necessary to accomplish proportional representation." Overton v. City of Austin, 871 F.2d 529, 543 (5th Cir.1989) (Jones, J., concurring.) Moreover, in fashioning an appropriate remedy, legislatures are not limited to single-member district plans. James v. City of Sarasota, 611 F.Supp. 25, 27 (D.C.Fla.1985), citing Wise v. Lipscomb, 437 U.S. 535, 98 S.Ct. 2493, 57 L.Ed.2d 411 (1978).
 
 
 21
 This deference by federal courts also extends to legislative choices in selecting the appropriate size of the legislature. See, e.g., Sixty-Seventh Minnesota State Senate v. Beens, 406 U.S. 187, 200, 92 S.Ct. 1477, 1486, 32 L.Ed.2d 1 (1972) ("Size is for the state to determine in the exercise of its wisdom and in the light of its awareness of the needs and desires of its people."); Clark v. Roemer, 777 F.Supp. 445, 453 (M.D.La.1990) ("As far as this court is concerned, the proper body to determine the optimum number of [members on the governmental body in question] is the ... [l]egislature."). Only when the evidence suggests that the legislature has chosen its size "solely in order to diffuse [minority] voting strength," should a federal court not afford such deference. McNeil, 851 F.2d at 946, (citing Carrollton Branch of NAACP v. Stallings, 829 F.2d 1547, 1551 (11th Cir.), cert. denied sub nom. Duncan v. Carrollton, 485 U.S. 936, 108 S.Ct. 1111, 99 L.Ed.2d 272 (1988)).
 
 
 22
 Applying these principles to the present case reveals several flaws in the district court's decision to reduce the size of Ahoskie's Town Council from five members to four. For example, we believe the district court should have deferred to Ahoskie's chosen size for its Town Council because the record contains no evidence whatsoever that Ahoskie created a five-member Town Council "solely in order to diffuse black voting strength." Id. In addition, in finding that Ahoskie's plan continued to dilute minority voting strength, the district court failed to focus on a potential districting plan for Ahoskie's five-member Town Council, but instead inappropriately compared the plan to a "hypothetical model based on [the] size necessary to accomplish proportional representation." Overton, 871 F.2d at 543 (Jones, J., concurring). Specifically, the district court found the 2-2-1 plan "inadequate because of the at-large fifth seat," and that a "two-district, four member town council fully complies with Section 2." (J.A.308).[4]
 
 
 23
 The mere fact that the district court erred in reducing the size of the Town Council does not, however, end our inquiry. This court must still determine whether Ahoskie's remedial plan "violates anew constitutional or statutory voting rights." McGhee, 860 F.2d at 115. Normally, courts utilize a "results" or "effects" test when analyzing a § 2 challenge to an electoral scheme. S.Rep. No. 97-417, 97th Cong.2d Sess. 27-30, reprinted in 1982 U.S.C.C.A.N. 177, 204-08. This "results" test "supposes the need to consider multiple electoral contests." Baird v. Consolidated City of Indianapolis, 976 F.2d 357, 359 (7th Cir.1992). Under this test, when examining past electoral results, courts consider several factors, including:
 
 
 24
 The extent of past discrimination, racially-polarized voting, election devices which enhanced the opportunity for discrimination, minorities suffering from the effects of discrimination, minorities elected to public office, political campaigns marked by racial appeals and minorities denied access to candidate slating.
 
 
 25
 James v. City of Sarasota, 611 F.Supp. 25, 31 (D.C.Fla.1985). However, when the challenged plan has never been implemented, "[a]n analysis of the[se] factors does not aid th[e] court in determining whether the proposed plan meets the requirements of the Act." Id. Therefore, because there are no election results under Ahoskie's proposed plan, applying these factors does not aid us in assessing the validity of the plan.
 
 
 26
 As part of the appropriate inquiry, we may not use "proportional representation as the ultimate standard for assessing the legal adequacy of a remedial legislative redistricting plan." Id. at 118. Rather, our analysis "must consider whether the protected voting group has a voting opportunity that relates favorably to the group's population in the jurisdiction for which the election is held." Smith v. Brunswick County, Va. Bd. of Sup'rs., 984 F.2d 1393, 1400 (4th Cir.1993). See also, Thornburg v. Gingles, 478 U.S. 30, 91, 106 S.Ct. 2752, 2787, 92 L.Ed.2d 25 (1986) (O'Connor J., concurring) ("Th[e] measure of vote dilution ... creates what amounts to a right to usual roughly proportional representation on the part of sizeable, compact, cohesive, minority groups."). Moreover, our analysis is guided by McGhee, 860 F.2d at 118, where this court announced:
 
 
 27
 If a vote dilution violation is established, the appropriate remedy is to restructure the districting system to eradicate, to the maximum extent possible by that means, the dilution proximately caused by that system; it is not to eradicate the dilution by altering other 'electoral ... structures' that were not actually challenged by the claims as made.... The maximum extent to which a particular dilution may be remedied by restructuring the districting system is constrained by the size, compactness, and cohesion elements of the dilution concept.
 
 
 28
 Thus, when evaluating a remedial plan for any potential vote dilution, we must "focus up front on whether there is an effective remedy for the claimed injury." McNeil, 851 F.2d at 942.
 
 
 29
 Applying these principles to the present case indicates that Ahoskie's plan for its five-member Town Council must withstand scrutiny because Ahoskie's plan provided blacks with the maximum available "opportunity ... to elect representatives of their choice." 42 U.S.C. § 1973. Specifically, Ahoskie's plan provided blacks an opportunity to elect two representatives of their choice and, because of their substantial voting age population [45.6 percent], exert substantial influence over the at-large election.
 
 
 30
 In the proceedings before the district court, Hines argued that Ahoskie's districting plan continued to dilute minority voting strength and a districting plan encompassing a swing district to elect the fifth Town Council member provided a more desirable remedy. Hines reasoned that, given the history of racially polarized voting in Ahoskie, an at-large election would essentially make the fifth Town Council position a safe white seat whereas a swing district would give blacks an equal opportunity to elect a candidate of their choice to this position. Ahoskie's expert, Dr. Arrington, also supported the notion that a swing district would be the ideal remedy when he testified:
 
 
 31
 And you've got a five member council. The only thing that makes sense here is that the black community should have two seats, regardless of whatever happens. That's a kind of minimum representation. The white count should have two seats, and then you want in some way to split down the middle seat.
 
 
 32
 (J.A. 307).
 
 
 33
 Unfortunately, Ahoskie's population effectively precluded establishing a true swing district. Specifically, Arrington testified that, because of the one person/one vote requirement, any swing district would have to contain roughly 900 people, but such a small district would be unworkable because a minor population shift of twenty people could alter the racial makeup of the district. Moreover, the district court found that a swing district could not be created, reasoning that Hines' proposed swing district would actually be a "safe minority district." (J.A. 309).
 
 
 34
 Because "the maximum extent to which a particular dilution may be remedied ... is constrained by the size ... element[ ] of the dilution concept," we believe the inability to create a true swing district requires us to accept Ahoskie's proposal. McGhee, 860 F.2d at 118. Other than a swing district, Ahoskie's proposal provided the maximum opportunity for both racial groups to "elect representatives of their choice." Gingles, 478 U.S. at 44, 106 S.Ct. at 2763 (quotation omitted).
 
 
 35
 In reaching this conclusion, we recognize the history of racially polarized voting and the majority white voting age population in Ahoskie create a strong chance that the candidate preferred by the whites may prevail in future at-large elections.[5] However, this fact, by itself, does not invalidate Ahoskie's proposal. It is well established that the Act only guarantees "the right to have free and equal access to the ballot box and to have the vote that is cast count the same as any other person's [but] does not endow the voter with the right to have his or her vote cast for the winner." Brunswick County, 984 F.2d at 1398. Moreover, because our analysis of Ahoskie's at-large plan "focus[es] up front on whether there is an effective remedy for the claimed injury," McNeil, 851 F.2d at 942, and, under the § 2 inquiry that we are required to undertake, there is no other apparent remedy feasible to provide blacks with more equal opportunities, we think the blacks' potential inability to elect a candidate of their choice to the fifth Town Council member position does not render Ahoskie's proposal legally insufficient. As the Seventh Circuit noted, "[The Supreme Court's opinion in] Gingles precludes some small and unconcentrated minority groups from attempting to rectify vote dilution even though they have 'less opportunity than other members of the electorate ... to elect representatives of their choice.' " Id. (quoting 42 U.S.C. § 1973(b)).[6]
 
 III
 
 36
 In her cross appeal, Hines contends that the district court erred by failing to implement a plan with three out of five single-member, minority-controlled districts. Hines reasons that under Gingles, the appropriate remedy for vote dilution requires the legislature to draw the maximum number of minority districts, regardless of the minority's proportion to the total population. See, e.g., Gingles, 478 U.S. at 91, 106 S.Ct. at 2787 (O'Connor, J., concurring) ("If, under a particular ... plan, qualified minority groups usually cannot elect the representatives they would be likely to elect under the most favorable single-member districting plan, then § 2 is violated."). Because Ahoskie could be divided into five single-member districts, three of which would contain a majority black population, Hines concludes that Gingles required the district court to implement such a plan. We disagree.
 
 
 37
 Section 2 of the Act proscribes any electoral scheme in which minorities "have less opportunity" to elect representatives of their choice. 42 U.S.C. § 1973(b) (emphasis added). Thus, the purpose of the Act is to ensure that minorities have an "equal opportunity to participate in the political processes and to elect candidates of their choice." Gingles, 478 U.S. at 44, 106 S.Ct. at 2763 (quotation omitted) (emphasis added). Under these principles, "the scheme must not operate to cancel out the voting strength of racial elements of the voting population." League of United Latin American Citizens Council No. 4434 v. Clements, 914 F.2d 620, 627 (5th Cir.1990), rev'd on other grounds sub nom., Houston Lawyers' Assoc. v. Att'y General of Texas, --- U.S. ----, 111 S.Ct. 2376, 115 L.Ed.2d 379 (1991). In other words, "while a vote must have equal weight, it is not, even if cast by a member of the protected class, entitled to have greater weight than any other vote." Brunswick County, 984 F.2d at 1398. Finally, a legislature may not devise a districting plan solely for the purpose of segregating citizens into separate voting districts on the basis of race without sufficient justification. Shaw v. Reno, --- U.S. ----, ----, 113 S.Ct. 2816, 2832, 125 L.Ed.2d 511 (1993).
 
 
 38
 In the present case, we believe that the plan proposed by Hines would violate these principles. Specifically, a plan giving a minority group a majority of the single-member districts would effectively "cancel out the voting strength" of the majority, Clements, 914 F.2d at 627, and provide the minority with a vote of greater weight than the majority. Nothing in the Act requires a remedy imposing overproportional representation. Moreover, because Hines acknowledged that the only motivation for such a districting plan would be racial concerns, i.e., providing blacks with another representative on the Town Council, and there is apparently no sufficient justification for such a plan, we believe such a districting plan would violate the equal protection rights of white voters. Shaw, --- U.S. at ----, 113 S.Ct. at 2832. Thus, the district court properly refused to implement Hines' proposed election plan for Ahoskie's Town Council.
 
 IV
 
 39
 For the reasons stated herein, we conclude that the district court properly rejected Hines' proposed election plan, but erred when it refused to accept Ahoskie's proposal in its entirety. Thus, we reverse the decision of the district court and remand with instructions for the district court to order Ahoskie's plan implemented.
 
 
 40
 REVERSED AND REMANDED WITH INSTRUCTIONS.
 
 
 
 [1]
 We will refer to Ahoskie's proposed plan as the "2-2-1 plan."
 
 
 [2]
 A "swing" district is one where the racial makeup of the citizens provide each racial group with equal voting strength
 
 
 [3]
 The district court also rejected Hines' proposal for five singlemember districts because "nothing in the ... Act permits a remedy that would impose overproportional representation." (J.A. 309)
 
 
 [4]
 We also believe the district court erred by reducing the size of the Town Council because, under the district court's plan, the Mayor essentially assumed the role of the fifth Town Council member. Specifically, the Mayor's capacity to vote on matters on which the Council was deadlocked would allow the Mayor to break the tie when the Council was divided along racial lines. Because the district court's plan provided for an at-large election for the Mayor, i.e., the same manner for electing the fifth Town Council member under Ahoskie's proposal, we see no real distinction between the plans devised by the district court and Ahoskie. This fact, coupled with the requisite judicial deference accorded to remedial election plans devised by legislatures, suggests that the district court should have adopted Ahoskie's plan in full
 
 
 [5]
 Given the nearly even racial composition of Ahoskie, i.e., blacks comprising 50.5 percent of the total population and 45.6 percent of the voting population, a candidate preferred by the blacks may also prevail in the at-large election by attracting a small amount of white voters
 
 
 [6]
 We also think the inability to create a true swing district distinguishes the instant matter from United States v. Dallas County Com'n., Dallas County Ala., 850 F.2d 1433 (11th Cir.1988), which the court below relied on in rejecting Ahoskie's proposed election plan. In Dallas County, the Eleventh Circuit rejected an election plan for the Dallas County School Board providing for two majority white, single-member districts; two majority black, single-member districts; and an at-large election for the fifth Board member. The Eleventh Circuit reasoned that the at-large election "perpetuates rather than ameliorates the inequities which have resulted in an abridgement of ... black citizens' access to the political process." Id. at 1440. However, the population within Dallas County, approximately 50,000, provided an available swing district to elect the fifth Board member. Thus, the at-large election did not provide the maximum available remedy. In contrast, Ahoskie's population would not support a true swing district