NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, INC., a New York nonprofit corporation; Columbia, South Carolina Branch of the NAACP; Norman P. Pendergrass, Sr.; Adell T. Adams; Beatrice T. McKnight; for themselves and for others similarly situated, Plaintiffs,

v.

CITY OF COLUMBIA, SOUTH CAROLINA, a public body corporate; Robert D. Coble, individually and as Mayor of the City of Columbia; E.W. Cromartie, II, individually and as Mayor–Pro–Tem of the City of Columbia; Luther J. Battiste, III, individually and as Mayor–Pro–Tem of the City of Columbia; Francenia B. Heizer; Jim D.N. Papadea; Anne M. Sinclair; Hamilton Osborne, Jr., individually and as members of the Columbia City Council; Marsha Duffy, individually and as Chairperson of the City of Columbia Election Commission; Andrew J. Lewis; John E. Montgomery, individually and as members of the City of Columbia Election Commission; and Tony L. Coleman Myers and Joseph S. Azar, individually and as candidates for Columbia City Council, Defendants.

Civ. A. No. 3:92–914–17.

United States District Court, D. South Carolina, Columbia Division.

Aug. 26, 1993.

**406**

John R. Harper II, Columbia, SC, Laughlin McDonald, American Civ. Liberties Union, Atlanta, GA, Willie Abrams, Dennis Courtland Hayes, NAACP Special Contribution Fund, Inc., Baltimore, MD, Kevin D. Kearse, Smalls Law Offices, Columbia, SC, for plaintiffs.

Roy Dawson Bates, James Shelton Meggs, Columbia, SC, Helen Tyler McFadden, Kingstree, SC, Katharine I. Butler, USC Law School, Columbia, SC, for defendants.

## ORDER

JOSEPH F. ANDERSON, Jr., District Judge.

This is a voting rights action by two civil rights organizations and three African American voters of Columbia, South Carolina, challenging the method of electing members of the Columbia, South Carolina City Council (hereinafter "City Council") under Section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973 *et seq.* (1988 & Supp. III 1991). The plaintiffs include the National Association for the Advancement of Colored People (NAACP), the Columbia branch of the NAACP, and Adell T. Adams, Norman P. Pendergrass, Sr., and Beatrice T. McKnight, African American residents and registered voters in the City of Columbia. The individual plaintiffs are also members of both the national NAACP and the Columbia branch. The NAACP is a non-profit, non-partisan membership organization whose goals include ensuring the political, educational, social, and economic quality of African American citizens of the United States. The defendants include the City of Columbia, its mayor and members of the Columbia City Council, the City of Columbia Election Commission, its Chairperson and its remaining members.[1]

At issue in this litigation is the so-called 4–2–1 method of electing members of the City Council for the City of Columbia. This method provides for four council members elected from single-member districts, two council members elected from the city at large, and the mayor, also elected at large. Plaintiffs seek to have an electoral plan imposed by this court which would require all members of the City Council to be elected from single-member districts, though continuing the at-large election of the mayor.

---

1. Defendants Tony L. Coleman Myers and Joseph Azar were candidates for an at-large council seat at the time this action was filed. They were named as parties because the plaintiffs sought to enjoin the election in which these candidates were running. The court did not enjoin the election, and both Myers and Azar lost to incumbent James Papadea. Hence, Myers and Azar have essentially no involvement in this litigation.

The plaintiffs contend that the election of two council members at large dilutes the voting strength of African Americans.

The court conducted a non-jury trial from July 12 through July 27, 1993. The plaintiffs offered testimony from two witnesses and two experts. The defendants offered testimony from the mayor, five lay witnesses, an at-large member of the Council, and three experts. The testimony at trial dealt with matters encompassing a period beginning with the adoption of the 1790 Constitution in South Carolina and ending with a City Council vote to rescind a garbage collection fee at a council meeting held just two weeks prior to the trial. After trial and after allowing the parties sufficient time to brief the issues in dispute, the court conducted oral argument on August 12, 1993.

Before proceeding to set forth its findings of fact and conclusions of law, it is necessary for the court to recite certain procedural developments relating to the City's election scheme and to enumerate the factors that are of concern to a court hearing a Section 2 Voting Rights Act challenge, so that the findings and conclusions may be placed in context.

### Development of the 4–2–1 Plan

This action represents the second challenge in the last fifteen years to the City's method of electing its City Council. In the first case, *Washington v. Finlay*, No. 77–1791 (D.S.C. Mar. 24, 1980), then-District Judge Robert F. Chapman upheld the method of electing City Council against a constitutional challenge of vote dilution. When *Finlay* was litigated, the City operated under a pure at-large method of electing its Council: four council members, plus a mayor, all elected at large. The plaintiffs in that action were African American registered voters in the City of Columbia who were also members of the NAACP. Judge Chapman's decision upholding the at-large method was affirmed by the United States Court of Appeals for the Fourth Circuit in a reported decision. *Washington v. Finlay*, 664 F.2d 913 (4th Cir.1981), *cert. denied*, 457 U.S. 1120, 102 S.Ct. 2933, 73 L.Ed.2d 1333 (1982).

The Fourth Circuit approved Judge Chapman's decision in all aspects save one. That exception proved significant for purposes of the litigation presently pending before the court. At the conclusion of his opinion, Judge Chapman had certified a plaintiff class, so that all African American voters in Columbia were bound by his decision in favor of the City. However, the Fourth Circuit reversed this portion of Judge Chapman's decision, holding that he improperly certified the plaintiff class at the conclusion of the litigation.

While the *Finlay* case was pending on appeal, the United States Supreme Court altered the legal standard for deciding a constitutional vote dilution claim in *City of Mobile v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980). In *Bolden*, the Supreme Court held that a claim of vote dilution must be established by proof (a) that vote dilution, as a special form of a discriminatory *effect*, exists and (b) that it results from a racially discriminatory *purpose* chargeable to the state. *Id.* at 66–70, 100 S.Ct. at 1499–1501. Prior to the *Bolden* decision, it had only been necessary for the plaintiff in a vote dilution case to show a discriminatory effect.

Although the plaintiffs in *Finlay* urged the Fourth Circuit to remand the case in light of the intervening *Bolden* decision, the court declined to do so. Instead, the court affirmed Judge Chapman's decision, holding that he had made sufficiently broad findings of fact and conclusions of law to sustain his position under the new *Bolden* standard. In other words, the Fourth Circuit concluded that Judge Chapman had found that the City's at-large election scheme had neither a discriminatory purpose nor a discriminatory effect.

Among the various findings of fact made by Judge Chapman, and affirmed on appeal by the Fourth Circuit under a "clearly erroneous" standard of review, were the following:

(1) Voting in the City is racially identifiable to a certain extent due to the racial make-up of certain neighborhoods and voting precincts, but voting is not polarized. African American candidates seek and receive support of voters in predominantly

white areas and white candidates do the same in African American neighborhoods. In recent elections, African Americans have received a larger percentage of votes from whites than white candidates have received from African Americans. *Washington v. Finlay,* No. 77-1791 at ¶ 26.

(2) The change made in 1910 from city wards to the at-large method for voting for City Council was not made to discourage greater participation by African Americans. *Id.* at ¶ 23.

(3) The failure to annex an area known as "Greenview" was not racially motivated, but was instead due to "serious legal questions as to the sufficiency of the annexation petition" because of allegations of forgery. *Id.* at ¶ 19.

(4) There was no evidence that African American candidates could not be elected under the at-large system. *Id.* at ¶ 30.

Prior to trial in the present action, the court denied defendants' motion in limine to preclude the relitigation of certain facts that had previously been determined in favor of the City in the *Finlay* case. Included among these facts were the four salient factors itemized above. The defendants made a strong case for application of the doctrine of issue preclusion by showing that the individual African American plaintiffs in *Finlay* were members of the NAACP, and that the local branch of the NAACP was kept apprised of the developments in the case and may have even contributed to the legal costs associated with that action. Nevertheless, the court conservatively held that the plaintiffs in the two actions were not the same. The court also decided that to impose such a procedural bar in this case would fly in the face of the Fourth Circuit's refusal to allow *Finlay* to be entered into judgment as a class action. Accordingly, this court declined to adhere strictly to the ,doctrine of collateral estoppel and allowed the plaintiffs to present evidence in these contested areas.

While *Finlay* was pending, two efforts were made, through local referenda, to adopt an election method more favorable to African Americans. The first, the so-called 3-3-1 plan, was defeated, as was the second proposal, the so-called 6-2-1 plan. After pre-vailing in the Fourth Circuit, city fathers embarked upon what the plaintiffs' expert described as a "heroic" effort to convince the voters to adopt the current 4-2-1 plan. In December 1981, the voters adopted 4-2-1, which is the election scheme under which the City operates today. Under the 4-2-1 plan, African Americans comprise a significant majority in two of the single-member districts, and whites comprise a majority in the other two single-member districts. The other two council seats, and the mayor, are elected at large.

When the first elections under the 4-2-1 plan were conducted in 1983, two African Americans were elected from the predominantly minority districts, and these same two individuals have continued to be elected through the date of the trial. It is this "mixed" method of electing the Council, adopted by the City after successfully defending its pure at-large system, that is under challenge in the litigation before the court.

### The Legal Standard for Determining Section 2 Voting Rights Act Challenges

*Section 2, as Amended*

Prior to the amendment of Section 2 in 1982, racial vote dilution cases were based on the Constitution. The constitutional standards were set out in *Whitcomb v. Chavis,* 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971), and *White v. Register,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), which were generally believed to ban electoral systems that resulted in minority voters having less opportunity than others to elect candidates of their choice, without regard to the motivation behind the adoption or maintenance of the challenged system. However, as noted above, in 1980 in *City of Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), the Supreme Court held that vote dilution claims were actionable only if the plaintiffs could establish that the election structure had been adopted or maintained for the purpose of depriving black citizens of the value of their votes. *Id.* at 66-70, 100 S.Ct. at 1499-1501.

Congress responded to the requests of civil rights groups and restored *White*'s "results" test in amended Section 2. Section 2 now reads:

(a) No voting ... practice ... shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen ... to vote on account of race or color, or [membership in language minority groups protected by the Act].

(b) A violation of subsection (a) of this section is established if, based on a totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973 (1988).

Congress's intent to return to the standard of *White* is evident in the language of the statute. The first sentence of part (b) of the Section is taken directly from *White* and first appeared in *Whitcomb.* The Senate Judiciary Committee Report on the amendment indicated that "[i]n adopting the 'results test' as articulated in *White v. Register,* the Committee has codified the basic principle in the case as it was applied prior to the *Bolden* litigation." S.Rep. No. 417, 97th Cong., 2d Sess. 27–30 (1982), *reprinted in* 1982 U.S.C.C.A.N. 177, 204–08; *see also Smith v. Brunswick County,* 984 F.2d 1393, 1398–99 (4th Cir.1993).

Moreover, the Report of the Senate Judiciary Committee sets out nine factors (hereinafter sometimes referred to as "the Senate Report factors"), gleaned from *White* and other pre-*Bolden* dilution cases, that the Committee considered to be relevant to the determination of a violation:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which the members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

Two additional factors [that may be probative] are:

8. whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; and

9. whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, standard, practice or procedure is tenuous.

S.Rep. No. 417, *supra,* at 28, 1982 U.S.C.C.A.N. at 206.

*Thornburg v. Gingles*'s *"Necessary Preconditions" to a Section 2 Suit*

The Supreme Court's most detailed interpretation of amended Section 2 to date came in *Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), a case challenging certain multimember districts, plus one single-member district, in North Carolina's post–1980 legislative apportionment plan. In *Gingles* the Court added a "gloss" to the analysis set out in the Senate Report. While any of the factors set out in the Senate Report may be relevant to a finding of dilution, the Court indicated:

> These circumstances are necessary preconditions·for [a violation].... First, the minority group must be ... sufficiently large and geographically compact to constitute a majority in a single-member district.... Second, the minority group must be ... politically cohesive.... Third, ... the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances ... usually to defeat the minority's preferred candidate.

*Id.* at 50–51, 106 S.Ct. at 2766–67 (citations omitted).

Courts have interpreted this portion of the *Gingles* opinion as setting forth factors that are *essential* to a plaintiff's case, but that are not, in and of themselves, conclusive of the existence of dilution. *See Burton v. Sheheen*, 793 F.Supp. 1329 (D.S.C.1992), *vacated by Statewide Reapportionment Advisory Comm. v. Theodore*, — U.S. —, 113 S.Ct. 2954, 125 L.Ed.2d 656 (1993).

■ Plaintiffs cannot prevail unless they carry their burden of proof on each precondition. Thus, there is no remedy for a group that lacks the numbers, or is too geographically dispersed, to benefit from single-member districts, even if every additional Senate Report factor is present. *McNeil v. Springfield Park Dist.*, 851 F.2d 937 (7th Cir.1988), *cert. denied*, 490 U.S. 1031, 109 S.Ct. 1769, 104 L.Ed.2d 204 (1989). Likewise, there is no "cognizable minority group" to claim the benefits of Section 2 unless the plaintiffs demonstrate that the jurisdiction's minority citizens are sufficiently unified in their support of particular candidates to have elected those candidates "but for" the presence of polarized voting. *Monroe v. City of Woodville*, 881 F.2d 1327 (5th Cir.1989), *cert. de-*

*nied*, 498 U.S. 822, 111 S.Ct. 71, 112 L.Ed.2d 45 (1990). Nor has the group been deprived of equal participation unless the majority votes in such a manner as to usually defeat the group's political choices. In *Gingles* the Court noted:

> It is obvious that unless minority group members experience substantial difficulty electing representatives of their choice, they cannot prove that a challenged electoral mechanism impairs their ability "to elect." ... Consequently, if difficulty in electing and white bloc voting are not proved, minority voters have not established that the multimember structure interferes with their ability to elect their preferred candidates. Minority voters may be able to prove that they still suffer social and economic effects of past discrimination, that appeals to racial bias are employed in election campaigns, and that a majority vote is required to win a seat, but they have not demonstrated a substantial inability to elect caused by the use of a multimember district.

478 U.S. at 48–49 n. 15, 106 S.Ct. at 2765 n. 15; *see also Sanchez v. Bond*, 875 F.2d 1488 (10th Cir.1989), *cert. denied*, 498 U.S. 937, 111 S.Ct. 340, 112 L.Ed.2d 305 (1990); *Harvell v. Ladd*, 759 F.Supp. 525 (E.D.Ark.1991).

### The Totality of the Circumstances

■ If, and only if, the plaintiffs carry their burden of proof as to each precondition must the court determine whether, based on the totality of the circumstances, including not only the remaining Senate Report factors but any other relevant evidence, the plaintiffs have been denied an equal opportunity to participate in the political process and to elect candidates of their choice. *Gingles*, 478 U.S. at 45, 106 S.Ct. at 2763–64. The ultimate question of dilution is one of fact, committed to the trial judge who is to decide it based on " 'an intensely local appraisal of the design and impact of the ... multimember district in the light of past and present reality, political and otherwise.' " *Id.* at 78, 106 S.Ct. at 2780 (quoting *White v. Regester*, 412 U.S. 755, 769–70, 93 S.Ct. 2332, 2341, 37 L.Ed.2d 314 (1973)).

After receiving the testimony, carefully considering all the evidence, weighing the credibility of the witnesses, reviewing the exhibits and briefs, and studying the applicable law, this court makes the following Findings of Fact and Conclusions of Law pursuant to Fed.R.Civ.P. 52. The court notes that to the extent any of the following Findings of Fact constitute Conclusions of Law, they are adopted as such, and to the extent any Conclusions of Law constitute Findings of Fact, they are so adopted.

## FINDINGS OF FACT

■ The legislative and governing body of Columbia is the City Council. It consists of seven members, one of whom is the mayor. Elections are non-partisan, and terms of office are for four years. To be elected to the Council, a candidate must receive a majority vote. The current districting plan is known as the 4–2–1 plan. Four members of the City Council are elected from single-member districts. Three members, including the mayor, are elected at large. Terms of office for the two at-large seats are staggered.

Columbia has a council-manager form of government. See S.C.Code Ann. §§ 5–13–10 to –100 (Law.Co-op.1976). Unlike the mayor under other forms of government who may have mainly administrative or ceremonial duties and who may vote only in case of a tie, the mayor under the council-manager form is a regular legislative member of council and has a vote the same as the other members. S.C.Code Ann. § 5–13–20. The council exercises all legislative powers of the municipality and determines all matters of policy. S.C.Code Ann. § 5–13–30.

At-large elections were first adopted for Columbia in 1910 by referendum. Prior to that time, the City was governed by a council that included up to sixteen aldermen elected from wards. The change to an at-large system was made to eliminate abuses of the ward system, and not out of a desire to keep blacks from participating fully in elections within the City.

Pursuant to the South Carolina Home Rule Act, Act No. 283 of the 1975 General Assembly, the City adopted the council-manager form of government consisting of a mayor and four council members. The at-large method of election was retained until the adoption of the 4–2–1 plan.

Thus, in 1983, the Council consisted of four council members elected at large, plus the mayor. As previously noted, in 1980 in *Washington v. Finlay*, the City successfully defended its all at-large election scheme against claims that the system diluted black voting strength. No. 77–1791 (D.S.C. Mar. 24, 1980). That lawsuit was based on a claim of "constitutional vote dilution," the standards for which were set out by the Supreme Court in *Whitcomb v. Chavis*, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971) and *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973). In *Finlay*, Judge Chapman concluded "that the plaintiffs had failed under *White v. Regester*'s standard to prove a discriminatory effect traceable to the at-large voting system.... [He further concluded] that there had been a failure to prove any racially discriminatory intent or purpose." *Finlay*, 664 F.2d at 918. Although no blacks had been elected to office under the challenged system, the court did not find this fact to be evidence of vote dilution. Rather, the court found that "[t]he election process of the City Council in Columbia is the most open and accessible that can be imagined." *Id.* at 922.

Despite having successfully defended the all at-large plan, the City undertook to respond to black citizens' concerns that no black representative had been elected to the City Council. The end result was the adoption of 4–2–1. Two earlier referenda failed. The first, which proposed three single-member districts and three at-large seats plus the mayor, was rejected by both black and white voters in a referendum held in December 1979. The second referendum, held in April 1981, which proposed six single-member districts and two at-large seats, plus the mayor, also failed.

In the spring of 1981, after the defeat of 6–2–1, the Greater Columbia Community Relations Council (CRC), a biracial group formed to promote better race relations, appointed a special committee of blacks and whites to study the "issue of Black representation on

City Council." The committee was of the view that a new method of elections should be adopted and that "[t]wo Blacks should be on City Council."

The special committee in turn appointed a sub-committee "to explore, examine and recommend to the larger group of black and white citizens and the Community Relations Council Board an election plan that would 'reasonably assure' the election of blacks to City Council." Included on the sub-committee were two of the plaintiffs in *Washington v. Finlay*, Frank Washington and Alvin Hinkle.

The sub-committee recommended a 4–2–1 plan, which the chair said was the result of "a lot of give and take, compromise and hashing out of ideas, suggestions and facts." The CRC adopted the recommendation of the sub-committee and submitted the 4–2–1 plan to the City Council in 1981. In its formal statement to the Council, the CRC said "[i]t is believed that [the existing at-large system] method prohibits Blacks from being elected."

In October 1981 the City Council voted three-to-two to conduct a third referendum, this time on the 4–2–1 plan. The following month, the court of appeals affirmed the decision of the district court in *Washington v. Finlay*, 664 F.2d 913 (4th Cir.1981).

The referendum on 4–2–1 was supported by Mayor Kirkman Finlay and two members of Council, Rudolph C. Barnes and Patton Adams. In addition, many prominent white civic leaders in the Columbia area spoke out publicly in favor of the plan. The 4–2–1 plan was opposed by Councilmen William Outz and Paul Bennett. In the election, 4–2–1 was supported by 98.9% of the African American voters and 26.9% of the white voters. The referendum was successful and 4–2–1 was adopted in December 1981.

Since the adoption of 4–2–1, two blacks, Luther Battiste and E.W. Cromartie, have been elected to majority black single-member district seats and have been re-elected in each subsequent election. At the present time, the Council is made up of these two black males, two white females, and two white males. The mayor is also a white male. No African American candidate has ever been elected to an at-large seat within the City.

The 1990 population of the City of Columbia as reported by the census was 98,052, of which 43.69% were black. Through annexations,[2] the population was increased to 100,757, which was the population utilized to redraw the four single-member districts to comply with one-person, one-vote requirements. (These changes were precleared by the Attorney General under Section 5 of The Voting Rights Act on January 27, 1992). Blacks make up a slightly larger share of the post-annexation population, 45.15%.

The 1990 census reported Columbia's voting-age population (VAP) as 78,779, of which 30,909 (39.24%) were black.[3] After the annexations, the VAP increased to 80,581, with blacks constituting 40.56% of the VAP.[4]

2. One hotly contested issue was whether racial animosity prevented an area known as Greenview from being annexed into the City earlier. The court finds, consistent with Judge Chapman's findings, that the failure to annex Greenview was due to legitimate legal concerns about the validity of the annexation petition.

3. Difficulty was encountered throughout the trial in determining the population of the City. Unlike most other governmental entities, a City's boundaries are routinely changed. The 100,757 figure is reported here because it served as the basis for the most recent redrawing of the district lines. The figure, however, is subject to constant adjustment through further annexations. Thus, the existing ratio of black to white citizens is subject to further fluctuation.

4. In addition to the census figures reflecting the voting-age population, the City produced evidence tending to show that the actual voting strength of blacks in the City is slightly less than the census VAP figures. Bobby Bowers, a widely respected statistician, testified that, although an exact calculation is impossible, his best estimate would be that the current black voting population in Columbia is between 38.5% and 40.5%. This is because there are certain institutions in the City (Fort Jackson military reservation, the University of South Carolina, Central Correctional Institution and various mental hospitals are examples) that are classified as "group quarters" by census bureau statisticians and included in the population statistics. However, a large percentage of persons residing in group quarters never vote in City elections, and many may not even be qualified to vote in City elections. The 38.5% to 40.5% figure represents the black voting-age population excluding the group quarters residents. Because Bowers's figures are only

The City produced witnesses known for their support of black voting rights and interests, all of whom voiced praise for the operation of 4-2-1 in terms of its effectiveness for the City, its unusual responsiveness to the concerns of black citizens, and its contribution to biracial cooperation in the political process. These witnesses were:

Jack Bass—a journalist and chronicler of Southern politics and race relations;

Milton Kimpson—currently Deputy Commissioner for the Department of Corrections, and formerly Executive Assistant to Governor Richard W. Riley and Director of the Community Relations Council;

Dr. Latta Thomas—Chairman of the Community Relations Council at the time 4-2-1 was adopted;

Jesse Washington—current Chairman of the Community Relations Council and an active participant in Columbia civic affairs; and

Durham Carter—lifelong resident of Columbia, community activist and political organizer.

Four of these five witnesses (Kimpson, Thomas, Washington and Carter) are African American and members of the NAACP.

The plaintiffs' witnesses included:

Benjamin Adams and his wife Adell Adams—registered voters within the City of Columbia and members of the NAACP;

Dr. Orville Burton—professor of history and sociology and university scholar at the University of Illinois at Urbana—Champaign; and

Dr. John C. Ruoff—historian, social scientist, statistician and demographer.

### Gingles's Tripartite Test

*The Extent to Which African Americans Are Geographically Compact*

Plaintiffs established that blacks in Columbia are geographically compact in that they could constitute a majority in one or more single-member districts.

Plaintiffs' expert Dr. John Ruoff prepared a 6-1 plan containing six single-member dis-

tricts with the mayor elected at large, in which blacks comprised population and VAP majorities in three of the six districts. The population in the three majority black districts ranged from 64.40% to 67.00%. The black VAP ranged from 58.47% to 63.84%.

Plaintiffs also introduced into evidence an 8-1 plan containing eight single-member districts with the mayor elected at large, in which blacks comprised population and VAP majorities in four of the eight districts. The population in the four majority black districts ranged from 63.97% to 72.41%. The black VAP ranged from 58.29% to 67.53%.

Plaintiffs' single-member district plans are reasonably compact and are no more irregular in shape than the districts actually in use under the existing 4-2-1 plan. The plaintiffs therefore have established the first *Gingles* precondition.

### Political Cohesiveness in the African American Community

■ To establish a prima facie case, plaintiffs must also establish the remaining two *Gingles* preconditions: *first* that the minority group is politically cohesive; and *second* that the white majority votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate. 478 U.S. at 50–51, 106 S.Ct. at 2766–67. These two elements are usually established by statistical evidence of racially polarized voting by the voters in the relevant political jurisdiction.

■ Following the language of *Gingles*, this court defines racially polarized voting to mean simply that there is a correlation between the race of the voter and the way in which the voter votes. *See* 478 U.S. at 54 n. 21, 106 S.Ct. at 2768 n. 21. In other words voting can be said to be polarized where "black voters and white voters vote differently." *Id.* While this definition is straight forward, applying it to the statistical evidence presented in this case has proven to be a difficult matter.

The issue of whether polarized voting currently exists in the City of Columbia was

slightly different from the census VAP figures, the court need not make a determination of how

the "group quarters" residents should be counted.

hotly contested by the parties, and the court has found this to be the most difficult issue in the case. Such is not surprising, however, as there are numerous unanswered questions in these treacherous waters. As noted by the Court in *Gingles,* "there is no simple doctrinal test for the existence of legally significant racially polarized voting." 478 U.S. at 58, 106 S.Ct. at 2770. The Court also recognized that "the degree of block voting which constitutes the threshold of legal significance will vary from district to district." *Id.* at 55–56, 106 S.Ct. at 2769. After evaluating the evidence, the court concludes that polarized voting does occur, at least to a certain degree, in the City of Columbia, but that it is not "legally significant" as required to establish a case of vote dilution under *Gingles. See id.* at 55–57, 106 S.Ct. at 2769–70.

Among the most troublesome issues concerning the existence of polarized voting are: (1) whether the court is confined to looking only at black versus white election contests or whether the court may also consider statistical evidence from white versus white races; (2) whether a "functional" approach to vote dilution cases allows the court to take into account the relatively poor turnout percentages by African American voters voting for African American candidates; (3) whether is it permissible for the plaintiffs to combine all African American votes cast for any African American candidates in any given election, to demonstrate political cohesion; and (4) what weight, if any should the court afford to Judge Chapman's finding in *Washington v. Finlay,* affirmed by the Fourth Circuit, 664 F.2d at 918, that in fact polarized voting does not exist to any significant degree in the City of Columbia. After carefully considering these difficult issues the court makes the following specific findings:

Plaintiffs have established that in white versus black elections, voters in Columbia are generally polarized in that, for the most part, blacks and whites vote differently. The plaintiffs' expert, Dr. Orville Burton, examined election returns and precinct data using bi-variate ecological regression analysis and homogenous precinct analysis. These methods are "standard in the literature for the analysis of racially polarized voting," and

both were approved by the Supreme Court in *Gingles,* 478 U.S. at 52–53 n. 20, 106 S.Ct. at 2767 n. 20.

The defendants' expert Dr. John D. Spurrier, who did not testify at trial, also used ecological regression analysis. To the extent that he and Dr. Burton examined the same elections, their analyses were virtually identical.

Dr. Burton analyzed six at-large black/white contests for City Council and one black/white contest for mayor from 1978–1986. He also analyzed five city referenda, including the referenda on 3–3–1, 6–2–1, and 4–2–1. Finally, he analyzed the voting in city wards for nine at-large black/white primary elections for the Richland County Council.

Dr. Spurrier analyzed one additional at-large black/white city contest not analyzed by Dr. Burton: the 1992 election for mayor. He also analyzed several white/white city contests, as well as the 1992 Democratic primary and general election (black/white) for the Sixth Congressional District. Therefore, between them the experts analyzed all of the at-large black/white contests for City Council and mayor since adoption of 4–2–1.

Dr. Burton's analysis of the black/white city contests is provided in the table in Appendix A, showing the date and nature of the election, the candidates identified by race, the percentage of whites voting for white candidates, and the percentage of blacks voting for black candidates.

Dr. Burton generated two sets of ecological regression estimates. The first two columns in Appendix A show the percentage of white and black *turnout* voting for white and black candidates. The third and fourth columns show the percentage of actual votes cast by whites and blacks for white and black candidates. The second set of estimates takes into account those voters who went to the polls but whose votes, for whatever reason, were not counted. The summaries at the end of each contest show the total percentage of the white vote cast for white candidates (TWVWC), and, where there was more than one black candidate, the total

percentage of the black vote cast for black candidates (TBVBC).

The elections analyzed by both Drs. Burton and Spurrier are identified in Appendix A with an asterisk. Dr. Spurrier's estimates based upon turnout are virtually identical to those of Dr. Burton set out in Appendix A.

In the seven at-large black/white city contests analyzed by Dr. Burton, using the Burton methodology, whites voted for white candidates at the average level of 93.96%, while blacks voted for black candidates at the average level of 73.87%.[5]

Dr. Burton also determined, for each black/white contest he analyzed, the preferred candidates of black and white voters. In six of the seven black/white contests analyzed, the candidates of choice of black voters were the least favored candidates of white voters.

In the most recent City Council contest held on April 7, 1992, however, the candidate of choice for both blacks and whites was James Papadea, a white candidate. Papadea received 72.4% of the black vote while Tony L. Coleman Myers, the sole African American candidate in the election, came in a distant second receiving only 11.1% of the black vote.

The referenda examined by Dr. Burton showed mixed results. Whites and blacks voted together to reject the 3–3–1 plan. The vote on 6–2–1 was polarized with the majority of blacks voting for the plan while the majority of whites voted against the plan. The vote on 4–2–1 was also polarized to a certain degree, with the majority of blacks supporting 4–2–1 while a majority of whites opposed it. However, the whites were not able to vote sufficiently as a bloc to defeat 4–2–1, which was adopted in December 1981.

 The court finds that racially polarized voting does exist in white versus black elec-

tions, but this does not end the inquiry. In order for plaintiffs to prevail on this factor, the court must go further to make a finding that polarized voting in the City of Columbia is legally significant. Legally significant racial bloc voting exists in general where "a white bloc vote ... normally will defeat the combined strength of minority support plus white 'crossover votes.' " 478 U.S. at 56, 106 S.Ct. at 2769. This is where the plaintiff's case breaks down upon closer scrutiny.

Defendants have essentially agreed with the plaintiffs that elections involving the City's voters are generally polarized when black candidates run. According to *Gingles*, elections are polarized so long as a majority of white voters tend to vote differently from a majority of black voters. 478 U.S. at 53 n. 21, 106 S.Ct. at 2768 n. 21. The parties also agreed that polarization is significant under Section 2 only if it usually results in the defeat of candidates of choice of minority voters—in other words, where the combination of black votes and white cross-over votes is insufficient to elect the candidate preferred by black voters. 478 U.S. at 56, 106 S.Ct. at 2769.[6]

The parties disagree over which candidates can be counted as "candidates of choice" of black voters, as well as over whether black or white voting was "responsible" for the defeat of those choices. In the elections analyzed, there were three black candidates who received at least majority black support. To the extent that support by a mere majority of voters at the polls makes a candidate the candidate of choice, Modjeska Simkins, John Roy Harper, and Reverend William M. Bowman qualified as candidates of choice of black voters, and they were defeated.[7] White voter behavior, however, cannot be the cause of these candidates' defeat if black voters themselves have failed to take reasonable steps to

---

5. This percentage is calculated by combining black votes for two or more black candidates when there were multiple black candidates in the race.

6. *See, e.g.,* District 23 in *Gingles.* Polarization was as evident in District 23 as it was in the remaining challenged districts, but black candidates were nevertheless elected. Thus, the polarization was not "legally significant" because it

did not result in the defeat of the candidates of choice of black voters.

7. In fact, in some elections, black candidates received substantially less than 50% of the black turnout. The elections involving Myers in 1992 (11.1% of the black turnout), and Redfern in 1978 (33.1% of the black turnout) are examples.

assure their victory. *See Smith v. Brunswick County*, 984 F.2d 1393 (4th Cir.1993).

As for white candidates for the at-large seats and for mayor, every candidate who received support from a majority of blacks at the polls was in fact elected, as was every candidate who finished first among black voters.[8] Except for Robert Coble in 1990, the first choices of black voters in white versus white contests were also the first choices of white voters. In the 1990 mayoral election, Coble was not the first choice of white voters, but was the first choice of blacks. Black votes provided the margin of victory for Coble. In 1986, Francenia Heizer finished a distant second to Harper among black voters in the first election, and second over all among all voters. However, in the runoff against Papadea, who finished first in the primary, Heizer was the first choice of blacks, but not of whites.

Appendix B is a table showing percentages of black turnout and black registration voting for black candidates for at-large seats under Columbia's 4–2–1 election plan. Appendix C presents a table showing the percentage of black turnout and registration voting for mayor and for white at-large candidates. These two tables were formulated from the statistical evidence presented at trial. As Appendix C indicates, mayoral candidates Finlay and Coble received more absolute black votes, as well as larger percentage of support from black registrants, than did any of the black candidates. Heizer, running in 1990, received more absolute black votes and support from a larger percentage of black registrants than did Harper or Bowman. Nevertheless, plaintiffs would not count white individuals as candidates of choice because, they say, blacks would have preferred to vote for a black candidate.[9]

If the whites who finished first among blacks are, however, considered the blacks' candidates of choice, then blacks' candidates of choice have not usually been defeated.

Indeed, their choices in at-large contests have been elected three out of three times for mayor and four of eight times for the at-large seats. Thus, whether blacks' candidates of choice have usually been defeated depends upon whether the white candidates count as "candidates of choice."

Unfortunately, a majority of the Supreme Court has yet to offer a definition of "candidates of choice." In *Gingles*, however, in a portion of the opinion that did not receive majority support, Justice Brennan indicated that the relevant inquiry concerned whether voters had elected the representative of "their choice." Brennan further explained that while the choice may often be black, the race of the candidate is immaterial:

> Thus, as a matter of convenience, we and the District Court may refer to the preferred representative of black voters as the "black candidate" and to the preferred representative of white voters are the "white candidate." Nonetheless, the fact that race of voter and race of candidate is often correlated in not directly pertinent to a § 2 inquiry. Under § 2 it is the *status* of the candidate as the *chosen representative of a particular racial group*, not the race of the candidate that is important.

478 U.S. at 68, 106 S.Ct. at 2775.

Later Justice Brennan noted: "Clearly, only the race of the voter, not the race of the candidate, is relevant to vote dilution analysis." *Id.* It is important, however, to recognize that the definition of "candidate of choice" was not the primary basis for a majority of the justices to disagree with this part of the opinion. Rather, the disagreement concerned the significance of the reasons why white voters had failed to support black candidates.

Several lower federal courts have followed, if not explicitly adopted, the plurality view. *See Sanchez v. Bond*, 875 F.2d 1488 (10th Cir.1989), *cert. denied*, 498 U.S. 937, 111 S.Ct. 340, 112 L.Ed.2d 305 (1990); *Williams*

---

8. Of the seven whites in contested elections, five received majority black support and were elected. Adams, running at large in 1986, received support from only 28% of blacks at the polls, but nevertheless ranked first. Heizer received 43% of the black vote in 1990 and ranked first.

9. Plaintiffs presumably would not count Papadea, a white candidate, in 1992 as a "candidate of choice," even though he received over six times as many black votes than did Myers, who is black. Their theory for not counting Papadea is not readily apparent.

v. Orange County, 783 F.Supp. 1348, 1361–62 (M.D.Fla.), aff'd, 979 F.2d 1504 (11th Cir. 1992), cert. denied, —— U.S. ——, 113 S.Ct. 2998, 125 L.Ed.2d 692 (1993); SCLC v. Evans, 785 F.Supp. 1469 (M.D.Ala.1992); Nipper v. Chiles, 795 F.Supp. 1525 (M.D.Fla. 1992). (The latter two cases involved Section 2 challenges to judicial elections). Additionally, in City of Carrollton Branch of the NAACP v. Stallings, 829 F.2d 1547 (11th Cir.1987), cert. denied, 485 U.S. 936, 108 S.Ct. 1111, 99 L.Ed.2d 272 (1988), the court, while not actually faced with the issue of whites as candidates of choice of black voters, nevertheless cited Justice Brennan's position with approval: "However, what is at least clear from the Court's opinion, is that racial bloc voting does not depend on the success or defeat of a particular candidate. Under Section 2, it is the status of the candidate as the chosen representative of a particular racial group, not the race of the candidate that is important." 829 F.2d at 1557.

In this circuit, the only case to raise the issue has been Collins v. City of Norfolk, 883 F.2d 1232 (4th Cir.1989), cert. denied, 498 U.S. 938, 111 S.Ct. 340, 112 L.Ed.2d 305 (1990). In that case, the Fourth Circuit concluded that certain white candidates did not count as candidates of choice of black voters because these candidates were the group's second and third choices in a vote-for-three situation, where the group's first choices had been defeated. The court did not reject the notion that whites could be the choice of black voters. Rather, the case stands for the logical proposition that a candidate, white or black, cannot be the choice of black voters if, within the same contest, another candidate was more "preferred" and was defeated.

In the present case, the only election involving a loss for blacks' first choice and a victory for their second choice was the 1986 contest for an at-large seat. Harper was the choice of blacks in the first election, but when he did not make the runoff, blacks supported Heizer. Ironically, under the analysis discussed above, Heizer, who was elected, was not the choice of either group. Under Collins, she was not the choice of black voters, having defeated their first choice, nor was she the choice of white voters, who preferred Papadea. Notably, however, even including Heizer, blacks' first choices have been elected more often than they have been defeated.

Furthermore, the plaintiffs' use of some statistics in support of their case is suspect. In an effort to demonstrate political cohesion, plaintiffs rely heavily upon statistics showing that a high percentage of African Americans who make it to the polls vote for African American candidates. However, the reliability of plaintiffs' statistics is questionable for two reasons: (1) the low numbers, relied upon by the plaintiffs, of African Americans that have turned out to vote for the candidates; and (2) the method of combining the bloc vote received by all black candidates in a particular race in order to determine the percentage of political cohesion for the black candidates.

Significantly, the Gingles Court observed that political cohesiveness can be demonstrated by showing that "a significant number of minority group members usually vote for the same candidate." 478 U.S. at 56, 106 S.Ct. at 2769 (emphasis added). Furthermore, a pattern of such voting over a period of time is more probative of political cohesiveness than is a single election. Id. at 57, 2769–70. Therefore, the clear impact of Justice Brennan's plurality opinion is that political cohesion means that a significant percentage of the minority population is aligned behind a certain political candidate or agenda. The plaintiffs' statistics showing that in certain races a large percentage of the minority voters who made it to the polls on a given election day voted together for the same candidates is certainly relevant to this inquiry. However, the relevance of this percentage as a gauge of minority cohesion is dependent upon black turnout.

In evaluating the statistical evidence presented by the parties on the issue of political cohesiveness, the court is mindful that a "functional" view of the political process is appropriate. The Senate Committee determined that "the question whether the political processes are 'equally open' depends upon a searching practical evaluation of the 'past and present reality.'" Gingles, 478 U.S. at 45, 106 S.Ct. at 2764. (quoting S.Rep. No.

417, 97th Cong., 2d Sess. 28, 30 n. 120 (1982), *reprinted in* 1982 U.S.C.C.A.N. 177, 205, 208. Here, the court cannot ignore the "political reality," as demonstrated in Appendices B and C, that very few blacks have chosen to vote in at-large contests for the City Council, even when a black has been on the ballot.

Consequently, the few blacks who voted in the at-large contests may not accurately reflect the degree to which the black electorate as a whole is politically cohesive. It is particularly appropriate to be wary of relying on black voter behavior in low black turnout elections to determine political cohesiveness when, as is true in Columbia, there is an inverse relationship between the degree of black turnout and the percentage of blacks voting for the black candidate. The evidence showed that as black turnout increases, black cohesiveness decreases.[10]

It is important to keep in mind that the ultimate reason voter cohesion is significant is because it directly bears on the issue of causation. As the Supreme Court noted, "[i]f the minority group is not politically cohesive, it cannot be said that the selection of a multimember electoral structure thwarts distinctive minority group interests." *Id.* at 51, 106 S.Ct. at 2766. Although the Court provided no further definition, it appears from this comment that the purpose of the cohesiveness requirement is to show that black voters have "distinctive political interests" to be furthered in the electoral body under

challenge. If they do not, then there is nothing to be thwarted. The best evidence of such "distinctive political interests" would appear to be the behavior of the group in voting for the offices in question.

The ultimate question should be whether the evidence demonstrates that blacks as a whole—not merely the plaintiffs or some segment of the black population—have distinctive political interests for the City of Columbia that they have attempted to further by voting together for candidates to the City Council. In most cases, that determination can be made from examining the behavior of the segment of the black population who chose to participate in the elections at issue.

Plaintiffs' evidence on cohesiveness in city elections under 4–2–1 is limited to three elections and four candidates. In the first election under the new plan, held in 1983, two blacks and four whites sought the two at-large seats. Plaintiffs' expert concluded that blacks were politically cohesive in this contest because 74% voted for the *two*[11] black candidates combined. *See* Appendix A. To say that voters who have split their vote among two or more candidates are "cohesive" is contrary to political reality.[12] One of the black candidates in the 1983 election, Reverend Scott, was supported by only 21.7% of blacks at the polls, which means that 72% of blacks at the polls capable of casting a ballot chose not to cast one for him.[13]

---

**10.** Black turnout was high in 1983, but only a bare majority of those at the polls chose to support even one of the black candidates. Black turnout dropped in the 1986 election, and more blacks at the polls supported the black candidate. Black turnout was very low in the 1986 special election, and an even larger portion of those voting supported the black candidate. Under the circumstances, the court would not be justified in assuming that the small percentage of black registrants who voted in the 1986 special election are an accurate reflection of the degree to which the black electorate as a whole is politically cohesive in its support of at-large candidates for the City Council.

**11.** The "vote-for-two" situation arose in the first election under 4–2–1, in which the entire council was elected at one time. The terms of the at-large members are staggered, therefore, the remaining elections involved a single seat.

**12.** Under Dr. Burton's theory, black voters could split their vote evenly among five black candidates and still be deemed politically cohesive, even if concentrating their vote for a single candidate would have resulted in that candidate's election.

**13.** "Roll-off" in this contest was relatively high among black voters. "Roll-on" is the votes cast per turned-out voter. If each voter had voted for two candidates, roll-on would have been 200%. However, only 118% of the available black ballots were cast for all of the candidates. Relatively high roll-off occurred throughout the elections analyzed. Dr. Burton, plaintiffs' expert, suggests that perhaps some of these ballots were "spoiled." This explanation appears highly speculative because voting machines are in use in the City, and the ballot for city elections is a simple one. In 1983, the vote-for-two situation presented blacks with an opportunity to "single shot" vote, thereby increasing the chances for electing one black candidate outright. To be effective, single-shot voting requires a high degree of cohesiveness in supporting a single candidate, which clearly did not happen in this contest.

Blacks were more united in their support of Modjeska Simkins, in that a slight majority, 52.3%, cast one of their two votes for her; however, almost an equal percentage, 47.7%, of black voters did not support her. This level of support does not compare favorably with support black voters have given black and white candidates in other elections. The relatively light support of Ms. Simkins, a nationally known civil rights leader, was particularly surprising since blacks had two votes to cast in this contest, and only 52% chose to cast one of their votes for her.

Defendants' expert, Dr. Harold Stanley, testified that "cohesiveness" is a relative term. A group is minimally cohesive if 50% of group members support a single candidate and maximally cohesive if 100% do. For purposes of the second prong of *Gingles*, a group claiming that the election system is *depriving it of the benefits of its numbers* should be able to demonstrate that the failure to elect a candidate of the group's choice was not due to a lack of cohesiveness of the group itself. Dr. Stanley demonstrated that had blacks in the polls voted as cohesively for Ms. Simkins as they often did for blacks running for other office, she would have been elected on the first ballot, rather than coming in third.[14]

The other two black candidates, Harper in the regular election of 1986 and Bowman in the special election of 1986, received support from a larger percentage of blacks in the polls. But the voters supporting these candidates constituted a very small portion of the black electorate. Nine percent of the active

black registrants supported Harper, and a mere 5.6% supported Bowman. When considered as a share of the eligible black electorate (approximately 26,000 persons), the percentages supporting these candidates drop to practically nothing—9.0% for Harper and 5.4% for Bowman. This does not appear to be what the Court had in mind in *Gingles* when it referred to a "significant number of minority group members." 478 U.S. at 56, 106 S.Ct. at 2769.

In light of the demonstrated ability of blacks to turn out, even in city elections, the failure of blacks to participate in these contests must be attributed to lack of enthusiasm for the candidates offering for election. Dr. Stanley testified that had as many blacks turned out for these contests as had voted in 1983, and had the additional blacks voted in the same manner as those who actually participated, both Harper and Bowman would have been elected.[15]

Plaintiffs have suggested that Dr. Stanley is merely spinning "gossamer possibilities" by selecting the black turnout rate from one election and combining it with the cohesiveness demonstrated by black voters in another. The court disagrees. The outcomes he hypothesized in regard to all three elections were well within the demonstrated ability of blacks both to turn out and to vote cohesively.

Plaintiffs also suggest that black turnout is low in city elections because turnout is lower across the board in city elections; because blacks still suffer the effects of past discrimi-

14. The recent opinion in *Smith v. Brunswick County*, 984 F.2d 1393 (4th Cir.1993), is helpful in evaluating whether blacks were cohesive in Ms. Simkins's contest. In *Brunswick*, black voters comprised a majority of the voting age population in three of five county electoral districts. Yet, when elections were held, all black candidates lost, apparently because some segment of the black electorate (approximately 20%) voted for the white candidates. The court refused to uphold the lower court's redrawing of the district lines to "enhance" the number of blacks in some districts. Instead, the court held that all the Voting Rights Act required was an opportunity to elect. "If the voting group of blacks have the numbers necessary to win and members of the group are allowed equal access to the polls, it cannot be rationally maintained that the vote is diluted." *Id.* at 1401.

Blacks of course are not a majority of Columbia's voters, but the principle at issue is the same. As was true in *Brunswick*, there were sufficient black voters in the polls to have elected Ms. Simkins had they chosen to vote for her in numbers within the range these same voters had supported other candidates. That they did not do so cannot be attributed to the electoral system or to white voters. Extending the analogy further, in *Brunswick*, black candidates were defeated, even though only 20% of blacks at the polls failed to support them. Here, 47.3% of blacks at the polls failed to support Simkins.

15. Again, the similarity to *Brunswick* is inescapable. Black voters had within their power the ability to elect these candidates. For whatever reason, they chose not to exercise it.

nation and cannot manage to vote; and because blacks have no hope of electing their choices at large and, therefore, chose not to vote at all.

The first observation appears to be accurate; voter turnout in city elections is generally lighter for both black and whites than for state-wide general elections. But Dr. Stanley's calculation that a greater turnout of blacks voting cohesively would have resulted in the elections of Harper and Bowman was based on black turnout in *actual* city elections.

The second observation is simply not supported by the record. Turnout for both blacks and whites varies significantly over time and is most logically related to the candidates offering for election and the issues generated by their campaigns. For example, turnout as a percentage of registration peaked for both blacks and whites in the hotly contested mayoral election of 1990. Moreover, black turnout actually exceeded white turnout in 1983 and 1984, the first elections under 4–2–1. If past discrimination were depressing black turnout, one would expect to see lower participation by blacks in elections closer to that discrimination, rather than in more recent elections.

The "discouragement" argument is also hard to accept based on the record presented here. Blacks turned out in record numbers in 1990 to support a mayoral candidate fighting an uphill battle to unseat an incumbent. furthermore, the discouragement argument is particularly implausible in explaining the low turnout for Bowman's 1986 special-election contest. The plaintiffs' own evidence shows that special elections have, in other situations, provided good opportunities for the election of black candidates. In two county special elections, black voters significantly "out mobilized" the supporters of white candidates, and as a result elected blacks on both occasions.

### Bloc Voting by Whites

The weight of the evidence does not indicate that a white bloc vote in Columbia will usually defeat the candidates of choice of black voters. Plaintiffs' evidence regarding polarized voting usually defeating black voter choices boils down to this: elections are racially polarized; three black candidates who ran for city-wide office lost; therefore, blacks cannot be elected at large. This is simply not sufficient to overcome the evidence that the blacks who lost owe their losses as much to blacks' failure to vote more cohesively or to turn out at all as to failure to achieve white support. To counter the view that a black candidate who mobilized the black vote could be elected at large, the plaintiffs offered only the testimony of Ben and Adelle Adams, which on balance cannot outweigh all the evidence to the contrary.

Furthermore, evidence was presented that today in Columbia, a black candidate could win an at-large seat on the Council. In 1978, running as a political newcomer under the prior all-at-large plan, present City Council member E.W. Cromartie was supported by approximately 25% of white voters.[16] Given the present black percentage of the electorate, this level of white support would elect a candidate today, so long as the candidate receives solid black support.[17] Dr. Stanley testified without contradiction that a black candidate need receive only 20 to 25% of the white vote, depending upon black turnout and cohesiveness, to be elected at large in the City.

16. This figure was hotly contested at trial. This court has made its own independent review of the returns and has determined that Cromartie did, in fact, receive approximately 25% of the white vote.

17. Buttressing the statistical analysis above, plaintiff witnesses (and NAACP members) Kimpson, Thomas, Washington and Carter all agreed that it was possible for a black to be elected to City Council today in an at-large election. Political consultant Cary Cranford, who has sampled city voters on a variety of issues, agreed. Cran-

ford, who testified as an informed lay witness, was of the opinion that race was not a barrier to election. He based his opinion in part upon his experience in the Coble campaigns, and in part on surveys conducted to determine attitudes and concerns of city voters. He found that Columbia Police Chief, Charles Austin, who is black, had a higher approval rating among white voters than did the mayor himself, who is white. Cranford testified that this kind of approval rating can often be converted into electoral success.

Therefore, conducting a "searching practical evaluation of the past and present reality" involving "an intensely local appraisal of the design and impact" of the election structure and white voter behavior, the court finds that the plaintiffs have failed to carry their burden of proof to show that a bloc voting majority can usually defeat the choices of black voters for the at-large seats.[18] Hence, the court finds that the plaintiffs have failed to prove all of the *Gingles* preconditions and, therefore, the plaintiffs have failed to prove a violation of Section 2 of the Voting Rights Act. *See* 478 U.S. at 48–49, 106 S.Ct. at 2765–66.

### The Totality of the Circumstances

■ Even if plaintiffs had carried their burden of proof on the *Gingles* preconditions, the court would be required to determine whether proof of these facts, in the context of the totality of the circumstances, indicates that blacks do not have an opportunity equal to that of others in the electorate to elect candidates of their choice and to participate in the political process. In making this inquiry, the court is guided by, but not limited to, the *Gingles* preconditions and the Senate Report factors. This court must consider all evidence that indicates the extent to which blacks are currently able to participate in the political process and to elect candidates of their choice. A mechanical application of any part of the test is simply at odds with the Supreme Court's mandate that this court base its decision on past and present political reality.[19] With these principles in mind, the court turns to the remaining factors listed in the Senate Report.

### 1. Past History of Discrimination Affecting Voting

In listing this factor, Congress made clear that it "was concerned not only with present discrimination, but with the vestiges of [past] discrimination which may interact with present political structures to perpetuate a historical lack of access to the political system." *Westwego Citizens for Better Gov't v. Westwego*, 872 F.2d 1201, 1211–12 (5th Cir.1989).

In this case, no credible evidence of present day discrimination was presented. There was, however, an abundance of uncontroverted testimony about South Carolina's past history of discrimination affecting voting, and the plaintiffs have unquestionably prevailed as to this part of the first Senate Report factor. Nevertheless, the court finds that there are no vestiges of past discrimination that significantly interact with present political structures to deny access to the political system.

As noted by Judge Chapman, in Columbia, as in most cities in the southeastern part of the United States, there is a long history of *de facto* and *de jure* racial discrimination. Devices employed by the state to disfranchise and discourage black voters included a poll tax, a literacy test, a grandfather provision for whites, and prolonged attempts to allow only whites to vote in the Democratic primary. In addition like most of the southern states, South Carolina also sought to enact barriers to the political rights advanced by the civil rights movement of the 1950's and 60's. The enactments included laws to maintain segregation in all facets of public education, places of public accommodations, and health care facilities. These discrimina-

---

18. This portion of the opinion has been written without regard to the fact that blacks control elections in two majority districts and have repeatedly elected blacks to those seats. When these candidates are "added," black voter choices of *black* candidates have "usually" been elected. Three of three black candidates for the at-large seats who received majority black support lost. Cromartie won in 1983, 1984, 1988, and 1992. Battiste won in 1983, 1986, and 1990. Thus, of the ten elections in which black candidates have run and received majority black support, they have been successful on seven occasions.

19. As noted in *Gingles:*

The Report stresses, however, that this list of typical factors is neither comprehensive nor exclusive. While the enumerated factors will often be pertinent to certain types of § 2 violations, particularly to vote dilution claims, other factors may also be relevant and may be considered. Furthermore, the Senate Committee observed that "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other."

478 U.S. at 45, 106 S.Ct. at 2763 (quoting S.Rep. No. 417, 97th Cong., 2d Sess. 29 (1982), *reprinted in* 1982 U.S.C.C.A.N. 177, 207).

tory laws have been widely documented in numerous reported decisions in this district. The defendants did not challenge the plaintiffs' assertion that South Carolina—and its capital city—have a past history of discrimination, particularly in regard to voting.

Most of these unfortunate events in South Carolina's history predate 1975. For example, the white primary was in effect until 1947. In addition, a literacy test was required for registration until it was banned by the 1965 Voting Rights Act. Most of the City's population is too young to have been effected by the white primary law or literacy tests. Significantly, plaintiffs have not identified any black citizens who today feel unable to participate in the political process because of the past existence of these requirements. Indeed, in *Finlay*, Judge Chapman found "[t]he election process of the City Council in Columbia is the most open and accessible that can be imagined." Although the Court of Appeals recognized "some ... hyperbole" in Judge Chapman's finding, the court nevertheless agreed that there were no legal or practical impediments to black voters or candidates in Columbia. 664 F.2d at 922. This court reaffirms that finding and, moreover, finds that nothing in the record of the present case indicates that the process has become "less open" since *Finlay* was decided. Indeed, registration has been made even easier by the adoption of "mail-in" registration. Black presence is evident at every stage of the political process from successful candidates to poll workers.

Thus, although there is a well-documented history of racial discrimination affecting voting in South Carolina, this discrimination has less of an impact on voting behavior by African Americans today than it had when Judge Chapman rendered his decision in 1980.

### 2. The Extent to Which Racially Polarized Voting Exists

This factor is subsumed in the second and third *Gingles* preconditions: (1) a politically cohesive minority, which does not exist in Columbia with respect to the seats challenged in this lawsuit; and (2) a bloc voting majority that usually defeats the candidates of choice of the group. The court finds that,

to the extent it has any independent significance, elections in which black candidates run are usually polarized in that a majority of blacks usually, but not always, support black candidates, while a majority of whites support white candidates. Polarization in contests in which no black candidates run is less common. In white on white contests, black and white voters more often than not support the same candidates. In the two white on white contests in which black and white voters preferred different candidates, those preferred by blacks were elected.

### 3. Enhancing Devices

The Senate Report directs that the court should consider the extent to which the City has used unusually large election districts, majority vote requirements, anti-single-shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group.

A majority of the votes is required for election to the City Council. Traditionally, such a practice has been viewed as enhancing the opportunity to discriminate against the minority. In a mixed electoral system such as Columbia's, however, such a provision is necessary to ensure that African Americans are adequately represented on City Council. Without this provision, black voters could not be assured of electoral control in the two majority black districts. No candidate favored by the black community has lost a race for an at-large seat because of the majority vote requirement.

The majority vote requirement also permitted blacks to elect their second choice to an at-large seat in 1986, after their first choice was defeated. In 1986, Heizer received sufficient support from blacks to force a run-off in which she defeated her opponent, even though her opponent finished first among whites in both contests. As this example demonstrates, without the requirement, the first choice of white voters would have been elected on the first ballot. Therefore, while majority vote requirements for at-large seats in some instances may enhance the opportunity for discrimination, the evidence before this court concerning the City of Columbia shows that the majority vote

requirement oftentimes benefits African American voters.

Furthermore, the City is not an unusually large electoral district, and no anti-single-shot provision is in place. Staggering the terms of the at-large seats, however, eliminates any possibility for single-shot voting.

### 4. Exclusion of the Group from Slating Organizations

There are no slating organizations in the City.

### 5. The Extent to Which the Group Bears the Effects of Discrimination in Other Areas that Affect Their Ability to Participate in the Political Process

The Senate Report instructs that the court should inquire into "the extent to which members of the minority group bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process," S.Rep. No. 417, *supra*, at 29, 1982 U.S.C.C.A.N. at 206 (footnote omitted). Thus, a past history of discrimination in other areas is relevant in so far as its lingering effects presently influence the ability of blacks to participate in the political process. *City of Mobile v. Bolden*, 446 U.S. 55, 69, 100 S.Ct. 1490, 1501, 64 L.Ed.2d 47 (1980).

No one can dispute that South Carolina has a history of discrimination in areas such as education, employment, and health care. Therefore, the only question here is whether there is a relationship between this past discrimination and current political participation by minorities. Evidence was presented that, comparing blacks to whites, a somewhat larger percentage of whites were registered to vote and turned out in elections. Such differences may arguably be explained by past discrimination. However, this court finds that an overall view of the evidence demonstrates that past discrimination is only par-

tially related to these differences between black and white voters.

First, the evidence showed that older blacks are more likely than young ones to be active voters. Dr. Stanley, relying upon official data from the State Election Commission, testified without contradiction that more than 85% of blacks aged 50 or older are active registrants, whereas only 66% of blacks between 25–34 are active registrants.[20] If past discrimination were affecting political participation, one would expect to see lower, not higher, participation by those 50 and over, who were more likely to have been directly affected by practices such as the white primary law, literacy tests, and other discriminatory laws.

In addition, black and white turnout rates vary considerably over time for both groups, and nothing in the evidence suggests that the variation in black turnout can be attributed to past discrimination. For example, white turnout in the 1983 mayoral and council elections was 31% of registration and black turnout was 34%. Seven years later, and seven years further removed from official discrimination, white turnout in the 1990 mayoral and council elections was 53%, but black turnout was 35%. After 1984, black voter turnout was considerably lower than that of whites, but, as with active versus inactive registration, the overall evidence suggests no strong link to past discrimination. The very same voters who failed to turn out in city elections voted in general elections in numbers far more in line with their percentage of the electorate.

Based on these registration and turnout statistics, the court rejects the notion that lower black turnout in city elections is attributable, to a significant degree, to the inability of blacks to learn of the election, to obtain transportation to the polls, or to mobilize in support of candidates and issues. A far more plausible explanation for low black turnout in city elections is the same as that for low turnout generally: voters are either

---

**20.** Of blacks aged 35–49, 76.3% are active registrants. Active registrants are those who have voted in either of the last two general elections. Registration in South Carolina is permanent, but those who do not vote in two consecutive general elections are put on an inactive list. Inactive

voters remain eligible to vote upon merely showing up at the polls with proper identification. The age category 18–24 was not considered on this issue because most voters in this category have not been registered long enough to be placed in the inactive category.

satisfied that the City is working well, thus little interest is generated by the campaigns, or they are generally uninspired by some of the candidates. As the 1990 mayoral contest demonstrates, a heated, hard-fought campaign will turn out the voters, both black and white.

### 6. Overt or Subtle Racial Appeals in Campaigns

Witnesses, both black and white, testified to the absence of racial appeals in campaigns. Indeed, the testimony indicated that black voters are specifically courted by candidates for mayor and the at-large seats, who perceive this bloc of votes as crucial to their election. In the 1990 mayoral election, for example, both candidates campaigned heavily for the African American vote. The Patton Adams mayoral campaign literature was quite explicit in this regard. In addition, Heizer testified as to her own significant campaign efforts in the African American community.

The only evidence presented of any racial appeals in any election related to statements made by an unsuccessful gubernatorial candidate in 1970, nearly twenty-four years ago. In addition to that election's remoteness in time, it was a state-wide gubernatorial election and, therefore, only tangentially relevant to the political climate of the City of Columbia. The plaintiffs also presented evidence of racial overtures made by two former City Council members who opposed 4–2–1 in the 1981 referendum. However, the court finds that the racial harmony exhibited in the more recent campaigns is more indicative of the present-day political climate within the City. Accordingly, these two instances in which racial appeals were made are, by modern standards, rather isolated incidents and are not indicative of current attitudes.

### 7. The Extent to Which Members of the Group Have Been Elected to Office

Since the present system of election was put in place in 1983, African Americans have

continuously occupied two of the six non-mayoral council seats. This gives African Americans 33.3% of the membership on Council, a figure that compares favorably with both total population and voting age population within the City.[21]

At the end of the plaintiffs' case, the court denied the City's motion for judgment as a matter of law. That motion was grounded upon 4–2–1's guarantee of black voter control over two of the council seats. The court found that the cases in which political bodies have won using such a theory have been cases in which the challenged plan placed the opportunity for proportional representation in the hands of black voters, see Baird v. City of Indianapolis, 976 F.2d 357 (7th Cir. 1992); see also Smith v. Brunswick County, 984 F.2d 1393 (4th Cir.1993); or the plan had, over a number of election cycles, produced proportional representation (Gingles, District 23).

While 4–2–1's guarantee of black control of two districts is not sufficient to immunize the plan from attack under Section 2, it is a significant factor in the totality of the circumstances analysis. The 4–2–1 plan is simply not like the all at-large plans more typically challenged under Section 2 in which blacks' ability to elect any candidate is dependant in part upon picking up support from whites. In Columbia, as in Baird and Brunswick County, the political outcome in two districts is solely in the hands of black voters.

### Additional Senate Report Factors

Under amended Section 2,

"Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are: whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group [and] whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous."

21. Although the Senate Committee indicated that the focus should be on the election of African Americans in the jurisdiction whose election methods are challenged (here, the City), it bears noting that blacks have also been elected to other offices, including Congress from the Sixth District, the State Senate and House, the Richland County Council and School Boards.

*Gingles,* 478 U.S. at 37, 106 S.Ct. at 2922 (quoting S.Rep. No. 417, *supra,* at 28–29, 1982 U.S.C.C.A.N. at 206–07).

These two additional factors were the subject of heated debate at trial. The plaintiffs maintained that no evidence should be received regarding these factors because the plaintiffs chose not to put them in issue. Although the court recognizes that the plain language of the statute indicates that these two additional factors may "in some cases" have probative value "as part of *plaintiffs'* evidence to establish a violation", *id.* at 37, 106 S.Ct. at 2922 (emphasis added), the *Gingles* Court emphasized that the list of relevant factors enumerated in that decision, and gleaned from the Senate Report, were "not exclusive." In addition, the court is mindful of its obligation to view the totality of the circumstances, including not only the Senate Report factors, but any other relevant evidence. Accordingly, the court received evidence on these factors and herewith makes the following findings of fact with regard to them.[22]

### 8. Responsiveness of Elected Officials to the Concerns of the Group

The court finds that the City Council has been responsive to the needs of black citizens in that blacks are well represented on all the appointed boards of the City[23] and on city employment rolls.[24] The court also finds that a disproportionate amount of the City's budget was spent in black communities.[25] The testimony in this regard was undisputed. Counsel for the plaintiff conceded at oral argument that the City has been extremely responsive to the needs of African American residents of the City. Although responsiveness is not a defense available to the City, it is at least a factor the court may consider in the totality of the circumstances.

### 9. The Tenuousness of the Policy Underlying the Challenged System

A policy is "tenuous" if the reasons behind it appear suspect. There is nothing tenuous about mixed electoral systems in general, or Columbia's use of this system in particular. Dr. Stanley testified that political scientists view mixed systems as providing the benefits of both at-large elections and single-member districts, while avoiding the evils of each. Mixed systems provide neighborhood, and therefore often minority, representatives, but nevertheless avoid the factionalism and "turfism" often associated with all single-member districts. Mixed systems provide the advantage of a city-wide perspective, but nevertheless avoid the problems often associated with at-large systems of lack of diversity on the council and neglect of neighborhoods.

The overwhelming weight of the evidence offered in this case suggests that Columbia's mixed system functions exactly as designed, in terms of attention to neighborhood concerns, but without resulting in factionalism or turfism. The Council operates for the overall best interest of the City, but displays racial, gender, and geographic diversity in its membership.

In addition, one cannot argue that the City adopted 4–2–1 to forestall a challenge to its election methods. The City had attained a

---

**22.** Although the court has made findings with regard to the two additional Senate Report factors (see paragraphs numbered 8 and 9) and to other factors not even mentioned in the Senate Report (see paragraphs numbered 10 and 11) it is important to note that none of these findings is critical to the court's ultimate finding of no vote dilution. The court's ultimate finding is principally based upon the plaintiffs' failure to satisfy the *Gingles* preconditions, or alternatively, upon the failure to prove vote dilution under a totality of the circumstances approach, looking only at the seven enumerated Senate Report factors.

**23.** Percentages of blacks who serve on significant boards and commissions are shown on the table attached as Appendix D.

**24.** Six of the eighteen positions under the city manager (supervisory positions for department head or higher), as well as one of the City's judges, are filled by blacks. *See* Appendix E.

**25.** For example in 1992, the total expenditures for parks and recreation for Districts 1 and 2, the two black districts, totalled $1,182,478 while expenditures in the other two districts totaled only $695,224. Relative percentages for expenditures of Community Development Block Grant funds are shown in Appendix F.

significant victory in defending its prior, all at-large method of electing City Council. Instead of resting on this victory, the City quickly joined in the effort to move to a mixed system in response to concerns of black citizens about the absence of black members on City Council.

### Other Relevant Factors

In conducting the intensely local appraisal of the impact of the electoral system, the court is not limited in its determination to the matters set out in the Senate Report. The Senate Report factors are "neither comprehensive nor exclusive.... [O]ther factors may also be relevant and may be considered." *Gingles,* 478 U.S. at 45, 106 S.Ct. at 2763. Thus, in reaching its determination the court must consider all evidence that reasonably bears upon the opportunity that the challenged system in fact provides for blacks to participate and to elect candidates of their choice.

10. *Columbia's 4–2–1 Plan was a Product of Biracial Cooperation, in Which Black Citizens Played a Decisive Role in the Plan's Formulation, and Black Voters Secured its Passage*

Had 4–2–1 not worked as planned, its overwhelming approval by black voters clearly would not immunize it from challenge under Section 2. However, the process by which the plan was produced, including its endorsement by the black electorate, is one more piece of evidence in the "totality of the circumstances." This court cannot lightly set aside a plan that at the time of its adoption represented a triumph for biracial politics.[26] More blacks voted in support of 4–2–1 than voted for the black candidates whose political defeats serve as the major basis for plaintiffs' claim of vote dilution.

11. *The 4–2–1 Plan Provides Equivalent, or Better, Genuine Influence for Blacks than the System Proposed by the Plaintiffs, While Also "Deracializing" Matters that Come Before the Council of Particular Concern to the Black Community*

If one theme of the defense of this case was that blacks have genuine political clout in Columbia,[27] the other was that the system works; it works for the City as a whole, and it works for blacks. Efficiency, harmony, and good government certainly cannot justify depriving black voters of the opportunity to elect candidates of their choice. But when, as here, the system guarantees some number of black council members, and the issue is whether a greater number should be guaranteed, the effectiveness of the challenged system at least bears mention by the court.

Testimony on the effectiveness of the mixed system for the City and its black citizens was overwhelming and essentially unrebutted. Witness after witness testified that the black community received a disproportionate share of the City's resources, primarily because the mixed system permitted the Council to respond to the needs of the City wherever they occurred. Dr. Stanley testified that, as a matter of political reality, this was unlikely to happen in a single-member system, where each official sees his or her political future in the hands of his or her district voters. In a single-member system, a council member's failure to demand an equal share of city resources for his or her district may jeopardize his or her future.

When districts are identified as "black or white," as they clearly would be under the plaintiffs' proposed six single-member dis-

---

**26.** The earlier 6–2–1 plan, actually sponsored by black citizens, was also a mixed plan, which, according to the testimony of E.W. Cromartie in *Finlay,* was the plan favored by the black community. (Pl.Ex. 18, p. 440). Although this plan called for two additional single-member districts, only two were expected to be majority black. (*Id.*) Thus, the plan initially advocated by the black community would have given black voters control over a smaller percentage of the council seats (2 of 8), than does 4–2–1.

**27.** The evidence showed that not once since 1986 have the black council members, when they voted together, been on the losing side of council vote. Defendants' expert, Jack Bass, contrasted this record with that of the four black members of the Montgomery City Council, who routinely lost divided council votes five-to-four. In Columbia, rather than finding themselves perpetually in the minority on issues before Council, the black representatives have never been on the losing side of an issue on which they have voted together.

trict plan, "district needs" become "racial needs." Professor Bass termed Columbia's response to needs "as needs of the city" rather than "black needs"—a "deracialization" of the needs. He and the lay witnesses agreed that the fact that every voter in the City can vote for a majority of the voting members of Council (the voter's own district representative, plus the two at-large seats and the mayor) diminishes turfism. Bass and the lay witnesses also agreed that eliminating that feature would, as a matter of political reality, re-orient both the elected officials and the voters to focus narrowly on matters within "their" districts. Eventually, the witnesses feared, political reality would force elected officials from white districts to "protect their turf" or risk voter discontent over a disproportionate part of the City's resources going to "black concerns."

Professor Bass went so far as to say that Columbia, through 4–2–1, had done a better job of deracializing issues to the ultimate benefit of all of its citizens than any place he had observed.

## CONCLUSIONS OF LAW

The court has jurisdiction of the parties and the subject matter pursuant to 28 U.S.C. §§ 1331, 1343, and 2201.

Congress amended Section 2 in 1982 in response to *City of Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), and to dispense with any requirement that plaintiffs prove racial purpose in voting rights cases. *Thornburg v. Gingles,* 478 U.S. 30, 43–4, 106 S.Ct. 2752, 2762–63, 92 L.Ed.2d 25 (1986) (Congress "dispositively reject[ed] the position of the plurality in *Mobile v. Bolden,* ... which required proof ... [of] the intent to discriminate").

In determining whether a challenged practice violates Section 2, the court must decide whether the practice "results in a denial or abridgement of the right ... to vote on account of race or color"—*i.e.,* whether minority voters "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U.S.C. § 1973(b) (1988).

The legislative history of Section 2, particularly the Senate Report, indicates that "a variety of factors, depending upon the kind of rule, practice, or procedure called into question," are relevant in determining if a plan "results" in discrimination. S.Rep. No. 417, 97th Cong., 2d Sess. 28–29 (1982), *reprinted in* 1982 U.S.C.C.A.N. 177, 205–06.

Typical factors identified in the Senate Report are set forth on pages 7 and 8 of this order and need not be restated here.

There is no requirement that any particular number of the Senate factors be proved, or that a majority of them point one way or the other. Instead, Section 2 "requires the court's overall judgment, based on the totality of circumstances and guided by those relevant factors in the particular case, of whether the voting strength of minority voters is, in the language of *Fortson* [*v. Dorsey,* 379 U.S. 433, 85 S.Ct. 498, 13 L.Ed.2d 401 (1965) ] and *Burns* [*v. Richardson,* 384 U.S. 73, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966) ], 'minimized or canceled out.'" S.Rep. No. 417, *supra,* at 29 n. 118, 1982 U.S.C.C.A.N. at 207.

The analysis of the Senate Report was approved and applied by the Supreme Court in *Thornburg v. Gingles,* 478 U.S. at 43 n. 7, 106 S.Ct. at 2762 n. 7 (describing the Senate Report as the "authoritative source" for the construction of Section 2), and has been adopted by this and the other circuits. *Collins v. City of Norfolk,* 883 F.2d 1232, 1236 (4th Cir.1989); *Carrollton Branch of NAACP v. Stallings,* 829 F.2d 1547, 1553–54 (11th Cir.1987), *cert. denied,* 498 U.S. 938, 111 S.Ct. 340, 112 L.Ed.2d 305 (1990); *Garza v. County of Los Angeles,* 918 F.2d 763, 769–70 (9th Cir.1990), *cert. denied,* 498 U.S. 1028, 111 S.Ct. 681, 112 L.Ed.2d 673 (1991); *Jackson v. Edgefield County, South Carolina School District,* 650 F.Supp. 1176, 1193 (D.S.C.1986); *Jeffers v. Clinton,* 730 F.Supp. 196, 205 (E.D.Ark.1989), *aff'd,* 498 U.S. 1019, 111 S.Ct. 662, 112 L.Ed.2d 656 (1991).

### Application of Section 2 to a Mixed Electoral System

The court must consider how these standards should be viewed in light of the fact that Columbia's system is one in which black

voters can, through their votes alone, control some number of seats on the City Council. It is clear that when an electoral system has resulted in near proportional representation for a protected group, it cannot violate Section 2. In *Gingles*, the Supreme Court reversed the trial court's determination of dilution in North Carolina's District 23 even though the Court had found all the dilution factors to be present. The Court held: "This persistent proportional representation is inconsistent with appellees' allegation that the ability of black voters in District 23 to elect representatives of their choice is not equal to that enjoyed by the white majority." 478 U.S. at 80, 106 S.Ct. at 2780.

The clear import of this holding, as well as standard notions of jurisprudence that there can be no remedy without an injury, is that no further inquiry is called for under Section 2 unless the plaintiffs demonstrate that the electoral scheme has resulted in unequal electoral outcomes.

The Supreme Court's holding in *Gingles* concerning District 23 is not clearly dispositive here, however, since black control of two seats is not precisely proportional representation, either as a share of the six seats subject to election from single-member districts, or as a share of the influence on Council's seven votes.

Nor has guidance from other courts been particularly helpful. The court has discovered no case squarely on point factually. In *Baird v. the Consolidated City of Indianapolis*, 976 F.2d 357 (7th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 2334, 124 L.Ed.2d 246 (1993), the court affirmed a grant of summary judgment to the defendant in a Section 2 case challenging the jurisdiction's mixed electoral system. There, the plaintiffs sought to eliminate the jurisdiction's at-large seats, even though the plan as a whole provided black control of a proportional number of seats. In rejecting the plaintiffs' demand for one additional seat, the court indicated that the presence of the *Gin-*

*gles* preconditions was immaterial "if other considerations show that the minority has an undiminished right to participate in the political process." *Id.* at 359.

As with the Supreme Court's ruling in *Gingles*, *Baird* is arguably distinguishable because there, black voters were in control of a proportional number of the governing body's seats. With only *Baird* as authority for when an electoral system provides sufficient minority control of seats to be immune from attack under Section 2, the court is unable to conclude that 4–2–1 does not violate Section 2 as a matter of law.[28]

■ Thus, this case appears to present an issue of first impression: how should an election system be evaluated under Section 2 when that system provides for some number of seats to be controlled by minority voters, but that number does not equal proportional representation? The answer must begin by recognizing that the Act specifically disavows a "right to have members of a protected class elected in numbers equal to their proportion in the population." 42 U.S.C. § 1973. Moreover, in this circuit, proportional representation may not be used "as the ultimate standard for assessing the legal adequacy of a remedial legislative redistricting plan. [Rather, the analysis] must consider whether the protected voting group has a voting opportunity that relates favorably to the group's population in the jurisdiction for which the election is held." *Hines v. Mayor & Town Council of Ahoskie*, 998 F.2d 1266, 1272 (4th Cir.1993) (quoting *Smith v. Brunswick County*, 984 F.2d 1393, 1400 (4th Cir. July 15, 1993)). If proportional representation is not the standard for an acceptable remedy for a proven violation, then clearly it is not the standard for determining whether an injury has occurred.

■ Next, due consideration must be given to the fact that apportionment is a matter for the legislature, and great deference must

---

**28.** In at least three other cases, mixed plans were approved over plaintiffs' objection as *remedies* for acknowledged violations of section 2. *See, James v. City of Sarasota*, 611 F.Supp. 25 (M.D.Fla.1985) and *NAACP v. Leon County*, 827 F.2d 1436 (11th Cir.1987) *cert. denied*, 488 U.S. 960, 109 S.Ct. 402, 102 L.Ed.2d 391 (1988). The opinions in these cases contained insufficient detail from which to determine how closely the overall plans approached proportional representation for the affected minorities.

be given to the legislature's choice in balancing the complex needs of the electorate. *Wise v. Lipscomb,* 437 U.S. 535, 98 S.Ct. 2493, 57 L.Ed.2d 411 (1978); *McGhee v. Granville County,* 860 F.2d 110 (4th Cir. 1988). Of course this deference does not extend to legislative choices that violate federal law. Deference to the legislature's choice of electoral systems does mean, however, that the mere fact that plaintiffs may prefer an alternative scheme, even one that is more favorable to the election of minorities, does not invalidate the legislature's plan. In concrete terms, the fact that an all single-member district plan might give black voters control over three seats on the City Council does not, without more, invalidate the City's mixed electoral scheme whereby black voters can control the election of two seats and influence the election of two additional seats.

Keeping these principles in mind—no right to proportional representation, even as a remedy, and deference to the legislature's choice—the court concludes that its task is to determine whether the 4–2–1 plan, viewed as a whole and not simply focusing on the two at-large seats, provides black voters with an

opportunity to elect candidates of its choice that relates favorably to the group's population in Columbia. In making that evaluation, the court is mindful that 4–2–1 provides blacks with control over the elections of two district seats. These two seats constitute 33.3% of the six non-mayoral seats on the Council, which are the only seats susceptible to election from single-member districts.[29] Blacks also have potential influence over two more of the non-mayoral seats—those elected at large—and have similar influence over the mayor.[30] In terms of influence over the Council's legislative agenda, the plan provides blacks with control over 28% of the legislative votes (*i.e.,* the votes of the council members whose seats they control) and shared influences over 42.9% of the remaining legislative votes (*i.e.,* the votes of the mayor and the two at-large council members). Only the votes of the two council members elected from overwhelmingly white single-member districts are beyond the influence of black voters.[31]

Racially polarized voting sometimes characterizes elections involving City voters—particularly those elections in which blacks

**29.** On several occasions in argument and in their pleadings, plaintiffs made clear that they do not maintain that the mayor should be elected from a single-member district.

**30.** The influence that the African American community has upon the entire Council was graphically demonstrated in a series of Council votes shortly before trial. A measure to impose a garbage collection fee, in lieu of property taxes, that was opposed by the black community was passed initially. The only "no" votes were those of the two black councilmen and Mayor Coble. These three opponents of the measure succeeded in having the matter reconsidered. Before the second vote, the black community lobbied intensively the two white at-large members. On the second vote, the two at-large members switched, and the garbage collection fee was rescinded. Ms. Heizer, one of the at-large council members, testified that she changed her vote because of the strong sentiments of the black community. She had earlier admitted that the black vote was crucial to her election. She also said that if she were representing a single-member district in the area where she lived, she would not have switched, as the white residents in that area were in favor of the garbage fee in lieu of taxes.

**31.** Defendants argue that under *Hines,* the City's plan is not dilutive as a matter of law. In *Hines,*

the appellate court ordered the Town's mixed plan—four district representatives and one at-large representative—implemented instead of the five single-member plan preferred by the plaintiffs. The Town's plan provided blacks with 40% of the seats, slightly less than their 45.6% of the VAP, whereas the plaintiffs' plan would have provided them with 60% of the seats. The court indicated that the Town's plan was an adequate remedy, even if it was unlikely that a black candidate would be elected to the at-large seat. Clearly, a plan that itself would be an adequate remedy for proven dilution under *Hines* can hardly be found to be dilutive. *Hines* is arguably distinguishable from the case at hand, however, because under the particular circumstances of Ahoskie, no plan was available that more closely approached proportional representation for blacks.

In Columbia, six single-member districts would give blacks, who are roughly 40% of the VAP, control of 50% of the divisible seats, but would give them something closer to proportional control over the legislative votes—42.9%, compared to 28% control in 4–2–1. In light of the fact that there was a full and complete trial in this case, the court is not required to decide whether the combination of control and influence over the electoral and legislative process 4–2–1 provides to blacks is sufficient under *Hines* to justify judgment as a matter of law.

have been candidates—in that a majority of black voters usually support the black candidates, and a majority of whites do not. Polarization alone is of limited significance, however, because the court has concluded that white voting has not been responsible for the defeat of candidates of choice of African American voters.

Even if African Americans were politically cohesive, and even if white bloc voting had resulted in the defeat of African Americans' candidates of choice for the at-large seats, the court nevertheless finds that, in the totality of the circumstances, African Americans' ability to elect candidates and to participate in the political process is equal to that of others in the electorate. The conclusion is based on the evidence and analysis set out above, particularly the fact that since the adoption of 4–2–1, blacks have continuously controlled two of the six seats on the Council (seven if the mayor is included), a percentage of the Council that reflects favorably to their proportion in the City's population. No one factor is outcome determinative; rather, the conclusion is based upon the record, taken as a whole, so as to provide an intensely local appraisal of African Americans' ability to participate in the political process in light of past and present reality in the City of Columbia.

### Conclusion

Thus, the court finds that the plaintiffs have failed to establish that the African American citizens have less opportunity than others in the electorate to participate in the political process and to elect candidates of their choice. Therefore, all relief is denied and judgment is entered in favor of the defendants.

IT IS SO ORDERED.

# APPENDIX A

PERCENTAGE OF TURNOUT AND PERCENTAGE OF VOTES,

BY RACE, IN CERTAIN CITY ELECTIONS, 1978 - 1986,

AS COMPILED BY DR. ORVILLE BURTON[†]

| ELECTION | CANDIDATE | % WH. TURNOUT | % BL. TURNOUT | % WH. VOTES | % BL. VOTES |
|---|---|---|---|---|---|
| 3/4/78 Mayor | | | | | |
| | Bolt (wh) | 32.1 | ·18.5 | 34.3 | 24.0 |
| | Finlay (wh) | 59.6 | 25.4 | 63.7 | 33.0 |
| | Redfern (bl) | 1.9 | 33.1 | 2.0 | 43.0 . |
| | TWVWC | 91.7 | | 98.0 | |
| | | | | | |
| 4/4/78 City Council (vote for 2) | | | | | |
| | Barnes (wh) | 54.8 | 1.9 | 29.7 | 1.3 |
| | Bennett (wh) | 58.2 | 1.8 | . 31.5 | 1.3 |
| | Corley (wh) | 12.5 | 7.6 | 6.8 | 5.3 . |
| | Lare (wh) | 12.5 | 7.1 | 6.8 | 5.0 |
| | Scott (wh) | 27.6 | 3.9 | 15.0 | 2.7 |
| | Clarkson (bl) | · 8.8 | 36.8 | 4.8 | 25.9 |
| | Cromartie (bl) | 4.9 | 52.0 | 2.7 | 36.6 |
| | Gilbert (bl) | 5.4 | 31.0 | 2.9 | 21.8 |
| | TWVWC | 165.6 | | 89.8 | . |
| | TBVBC | | 119.8 | | 84.3 |

---

[†] The data for the 1978 and 1983 runoff elections are not included in this table because accurate data for runoffs is not available from the South Carolina Election Commission. Although the plaintiffs' expert, Dr. Burton, attempted to formulate the entries for the runoffs using registration data, rather than turnout data (See plaintiffs' exhibit 25), it would be inappropriate to include those projections in this table. To do so would be, in the words of plaintiffs' other expert, Dr. John C. Ruoff, like "comparing apples to oranges."

| ELECTION | CANDIDATE | % WH. TURNOUT | % BL. TURNOUT | % WH. VOTES | % BL. VOTES |
|---|---|---|---|---|---|
| 3/1/83 City Council* (vote for 2) | | | | | |
| | Barnes (wh) | 51.8 | 11.2 | 31.2 | 9.5 |
| | Bennett (wh) | 53.4 | 5.3 | 32.8 | 4.5 |
| | Fox (wh) | 32.4 | 13.8 | 19.5 | 11.7 |
| | Taylor (wh) | 15.9 | 13.6 | 9.6 | 11.5 |
| | Simkins (bl) | 8.6 | 52.3 | 4.7 | 44.4 |
| | Scott (bl) | 3.0 | 21.7 | 1.8 | 18.4 |
| | TWVWC | 154.5 | | 93.1 | |
| | TBVBC | | 74.0 | | 62.8 |
| 4/1/86 City Council* (vote for 1) | | | | | |
| | Hanna (wh) | 13.6 | 7.4 | 16.1 | 8.9 |
| | Heizer (wh) | 25.6 | 8.2 | 30.3 | 9.8 |
| | McClam (wh) | 3.8 | 1.5 | 4.5 | 1.8 |
| | Papadea (wh) | 33.4 | 0.0 | 39.6 | 0.0 |
| | Rutland (wh) | 1.4 | 2.1 | 1.7 | 2.5 |
| | Taylor (wh) | 5.8 | 3.5 | 6.9 | 4.2 |
| | Harper (bl) | 0.8 | 63.9 | 0.9 | 76.4 |
| | TWVWC | 83.6 | | 99.1 | |
| 10/7/86 City Council Special Election* (vote for 1) | | | | | |
| | Brooks (wh) | 16.3 | 8.0 | 16.4 | 8.0 |
| | Papadea (wh) | 81.4 | 7.4 | 82.1 | 7.4 |
| | Bowman (bl) | 1.4 | 84.8 | 1.5 | 84.8 |
| | TWVWC | 97.7 | | 98.5 | |

# APPENDIX B

PERCENTAGE OF BLACK TURNOUT AND BLACK REGISTRATION VOTING

FOR BLACK CANDIDATES FOR AT-LARGE SEATS UNDER

COLUMBIA'S 4-2-1 ELECTION PLAN[†]

| Yr. | Candidate | EBTO | E%BTO/BC[††] | EBV/BC | BREG | %BRV/BC |
|-----|-----------|------|--------------|--------|--------|---------|
| 83 | Simkins | 4728 | 52.6% | 2487 | 13,906 | 17.9% |
| 83 | Scott[*] | 4728 | 21.9 | 1035 | 13,906 | 7.4 |
| 86 | Harper | 2003 | 64.1 | 1284 | 14,307 | 9.0 |
| 86S | Bowman | 928 | 84.6 | 785 | 14,568 | 5.4 |
| 92 | Myers[**] | 945 | 11.1 | 105 | 11,209 | 0.9 |

[†] EBTO=estimated black turnout. E%BTO/BC=percentage of BTO estimated to have voted for black candidate. EBV/BC=estimated number of blacks voting for candidate. BREG=active black registration. %BRV/BC=percent black registration voting for black candidate.

[††] The figures in this column vary slightly from those compiled by Dr. Burton and shown in Appendix A. The differences are all less than three-tenths of one percent.

[*] Ranked second among black voters in a vote for two contest.

[**] Ranked second among black voters in a vote for one contest.

# APPENDIX C

PERCENTAGE OF BLACK TURNOUT AND BLACK REGISTRATION

VOTING FOR MAYOR AND WHITE AT-LARGE CANDIDATES[*]

| Yr. | Candidate | EBTO | E%BTO/C | EBV/C | BREG | %BRV/C[†] |
|-----|-----------|------|---------|-------|------|-----------|
| 83 | Finlay (M) | 4728 | 55.3% | 2615 | 13,906 | 18.8% |
| 84 | Adams (AL) | 2318 | 28.2 | 654 | 13,655 | 4.8 |
| 86 | Adams (M) | 2003 | 62.7 | 1256 | 14,307 | 8.8 |
| 88 | Papadea(AL) | 1249 | 52.6 | 657 | 11,888 | 5.5 |
| 90 | Coble (M) | 4406 | 58.0 | 2555 | 11,154 | 22.9 |
| 90 | Heizer (AL) | 4406 | 43.6 | 1921 | 11,154 | 17.2 |
| 92 | Papadea(AL) | 945 | 72.4 | 684 | 11,209 | 6.1 |

[*]Includes only white candidates who ranked first among black voters in the contest. In all cases, these candidates were elected.

[†]EBTO=estimated black turnout. E%BTO/C=percentage of BTO estimated to have voted for white candidate. EBV/C=estimated number of blacks voting for candidate. BREG=active black registration. %BRV/C=percent black registration voting for candidate.

# APPENDIX D

CITY OF COLUMBIA BOARD AND COMMISSIONS

Positions: 319

Minority: 99

Percent of Minority: 31%

| Significant Boards and Commissions | Minority/Total | |
| --- | --- | --- |
| Accommodations Tax Advisory | 2 | 7 |
| Board of Assessment Appeals | 0 | 1 |
| Board of Assessment Control | 1 | 1 |
| Central Midlands Regional Planning Council | 3 | 3 |
| Board of Electrical Adjustment and Appeals | 2 | 4 |
| Board of Gas Adjustment and Appeals | 0 | 4 |
| Columbia Housing Authority | 3 | 7 |
| Housing Board of Adjustment and Appeals | 2 | 5 |
| Mechanical Board of Adjustment and Appeals | 1 | 5 |
| Municipal Court | 1 | 4 |
| City Planning Commission | 3 | 9 |
| Plumbing Board of Adjustment and Appeals | 1 | 5 |
| Revolving Loan Board | 3 | 5 |
| Zoning Board of Adjustment and Appeals | 2 | 7 |
| TOTALS | 24 | 67 |
| PERCENT MINORITY | 35.8 | |

# APPENDIX E

BLACKS IN SUPERVISORY POSITIONS IN CITY OF COLUMBIA

(Department Heads or Higher)

| | | |
|---|---|---|
| Assistant City Manager | — | Charles Williams |
| Police Chief | — | Charles Austin |
| Municipal Court Administrator | — | Gladys Brown |
| Municipal Judge | — | Lincoln Jenkins |
| Director of Parks & Recreation | — | Veryl McIntyre |
| Public Information Director | — | Benish Brown |
| City Clerk | — | Zenda Leaks |

# APPENDIX F

Community Development Block Grant Funds — 1983 to 1992

Blacks % — Percentages of total numbers of households/persons assisted who are black [reports for all years viewed collectively]:

| PROGRAM | | BLACK % |
|---|---|---|
| Drug Abuse | | 73.6% |
| Tutorial Program | | 100.0% |
| Youth Games | range | 61.3% to 66.67% |
| Relocation Program [except on two projects] | range | 95% to 100.0% |
| Rehabilitation single family residences | average | 73.8% |
| Residential revolving loan fund | | . 100% |
| Job development | range | 64.6% to 97% |
| Home weatherization | range | 63% to 68.62% |
| Housing Development Corporation | range | 66.6% to 100% · |
| Summer Youth Employment & Intern Programs | range | 81% to 90% |